The STATE of Ohio, Appellee,

v.

BAKER, Appellant.

[Cite as *State v. Baker* (2000), 137 Ohio App.3d 628.]

Court of Appeals of Ohio,
Twelfth District, Clinton County.

No. CA98–07–020.

Decided April 3, 2000.

*William E. Peelle,* Clinton County Prosecuting Attorney, and *Richard W. Moyer,* Assistant Prosecuting Attorney, for appellee.

*Fred Miller* and *Scott J. Frederick,* for appellant.

*Rittgers & Rittgers* and *W. Andrew Hasselbach,* urging reversal for *amicus curiae* Ohio Association of Criminal Defense Lawyers.

WALSH, Judge.

Defendant-appellant, Tracey J. Baker, appeals his convictions in the Clinton County Court of Common Pleas for obstructing justice in violation of R.C. 2921.32(A) and tampering with evidence in violation of R.C. 2921.12(A)(1). We affirm appellant's convictions.

On August 7, 1997, Vincent Doan was found guilty of the kidnapping and aggravated murder of his girlfriend, Clarissa Ann Culberson, a.k.a. Carrie Culberson. Carrie's body was never recovered. Appellant, Doan's half-brother, was indicted on September 15, 1997 on two counts of obstructing justice, one count of tampering with evidence, and one count of gross abuse of a corpse in connection with the murder. The indictment alleged that appellant "did, with

purpose to hinder the discovery, apprehension, prosecution, conviction, or punishment of Vincent Doan for a crime or to assist Vincent Doan to benefit from the commission of a crime, provide Vincent Doan with means of avoiding discovery or apprehension, [and] destroy or conceal physical evidence of the crime." The indictment also alleged that appellant, "knowing that an official proceeding or investigation [was] in progress, or [was] about to be or likely to be instituted, did alter, destroy, conceal, or remove any thing, with purpose to impair its value or availability as evidence in such proceeding or investigation." Appellant was arrested six days later in Florence, Kentucky, in the early hours of September 22, 1997, following a foot chase which ended near Interstate Highway 75. A jury trial held from May 18 through June 4, 1998 revealed the following facts:

Lori Baker and appellant were married in 1982 and divorced in 1985. They got back together in 1987 and lived together until they separated in October 1996. Although living together, they both were involved in other relationships. Lori had a sexual relationship with Doan from March to September 1996; appellant dated Robin Eden from July 1996 to July 1997.

On the evening of August 28, 1996, appellant, an independent truck driver, came home at about 11:00 p.m. and went to bed shortly thereafter. At the Baker home that evening were appellant, Lori, Vicki Watkins (Lori's twin sister), the Bakers' children, and Vicki's four children. Vicki spent the night at the Baker home that evening because her car had broken down that day and she needed Lori to drive her to work the following day. Lori was the babysitter of Vicki's children that summer while Vicki worked a 6:00 a.m. to 3:00 p.m. shift. Both Lori and Vicki testified that Vicki was not supposed to be there because appellant did not allow Vicki and her children to stay overnight. Vicki went to bed between 10:30 p.m. to 11:00 p.m. and heard appellant come home.

Vicki was awakened at 3:15 a.m. by a knock on the back door adjacent to the window of the bedroom in which she was sleeping. Vicki looked through the venetian blinds and recognized Doan. Vicki testified that the visibility was good because there was a motion light "right beside the [back] door." Doan was not wearing a shirt and was looking down. His right hand, which was crossed over his left arm, was "dirty, grungy looking," and his hair was "messed up." Asked if she saw any blood on Doan that night, Vicki replied, "No, [she] didn't look no further down." After Lori answered the door, Vicki, who was back in bed, heard Doan ask if appellant was home. Lori replied that he was. Doan entered the Baker home and shut the door. About one-half hour later, at about 3:45 a.m., Vicki heard appellant and Doan leave through the back door. Appellant and Doan had a brief conversation on the back porch before they left in appellant's pickup truck. Although she could not hear what was being said, Vicki heard Doan giggle.

Lori was awakened at 3:17 a.m. by a knock on the back door. When she answered the door, Doan was standing outside, his head down, and his right hand holding his left arm. Doan was wearing only jeans and was barefoot. Lori testified that Doan had blood "smeared" on his hands, arms, and chest, and that his hair was "messed up." Lori testified that Doan had "this funny look on his face." Doan asked for appellant. Lori motioned him to the master bedroom. That bedroom has a separate bathroom. Lori then went to the kitchen to make coffee.

While she was in the kitchen, Lori heard the shower running and appellant going outside and coming back in. Shortly thereafter, while the shower was still running, appellant asked Lori for garbage bags. Doan reappeared from the bedroom at 3:45 a.m. looking "a lot better" and with "clean and brushed" hair. Doan was now wearing boots, different jeans, a T-shirt, and a shirt. Shortly after, appellant and Doan left with seven garbage bags and appellant's gun. They left in appellant's pickup truck.

As soon as appellant was gone, Lori went to wake Vicki and get her out of the house before appellant's return. They left the house at 4:45 a.m.[1] and first went to Vicki's house to get her work badge. Thereafter, while en route to Vicki's work, Lori told her sister that appellant and Doan had left earlier with seven garbage bags and a gun. Lori opined that "they probably killed Carrie and chopped her up." The sisters then "parted Carrie out," that is, they tried to figure out which parts of the body would go into the bags. After Vicki stated that they "shouldn't be talking like that," they remained silent for the remainder of the trip. Vicki testified that she had never seen her sister "nervous and scared and upset like that before."

Lori dropped Vicki off at 5:00 a.m. and was home and in bed by 5:05 a.m. She was awakened at about 5:50 a.m. by appellant who asked her for some bleach and a scrub brush. When Lori started to take the items to the children's bathroom where Doan was taking a shower, appellant took the items from her and took them to his half-brother himself. Appellant then instructed Lori to wash the jeans and black T-shirt he was wearing when he left with Doan. Appellant instructed Lori to "pay special attention to a spot on his jeans." While washing the clothes, Lori noticed some blood on the jeans and what appeared to be bloody spots on the black T-shirt. Lori ended up washing the clothes four to six times that day in order "to get the spot out." Lori also noticed several blood spots on appellant's left boot as appellant was wiping them off with a rag. An analysis of

---

1. Although Vicki's shift was normally from 6:00 a.m. to 3:00 p.m., she went to work at 5:00 a.m. on August 29, 1996 so she could leave work at 2:00 p.m. to take one of her children to the doctor's office.

the boots later showed human blood on them; however, the blood was too degraded to identify its type.

When appellant was pointing to the spot on his jeans, Lori observed what looked like blood "caked around, underneath his nails" and "smeared up his arm." While washing his jeans, Lori asked appellant if they had killed Carrie and chopped her up. Appellant "looked awful funny," his "eyes got real big and he got in [Lori's] face and told [her] to shut * * * up, [she] didn't know what [she] was talking about." Appellant took a shower. Doan emerged from the children's bathroom at 6:20 a.m. wearing the same clothes and boots he was wearing when he left earlier with appellant. Doan and appellant talked for a few minutes. Although appellant and Doan usually laughed and giggled when they were together, they talked "real low" that morning. Doan left for work at 6:25 a.m. When appellant left for work at 6:50 a.m., he told Lori "the cops are coming but they're not coming for what you think they're coming for, but get rid of [the marijuana plants] anyway."

Lori went on with her day. After dropping Vicki's children and her children at school, she went to a tanning booth at about 10:00 to 10:30 a.m. Diane Shelton, a.k.a. Dee Shelton, the booth's owner, asked her what was wrong. Lori replied, "nothing." As Lori was leaving, Doan arrived and asked to borrow her Honda later that day supposedly so that a potential buyer could look at his Mustang at 7:00 p.m. Early that afternoon, Lori went to pick up the children at school. While there, she saw Carla Williams, her best friend at the time, and asked her if she had seen Carrie. Carla replied that she had not. Carla testified that Lori told her that "she thought [Doan] had killed Carrie and that [appellant] had helped but she wasn't sure." Carla testified that Lori was "very upset, nervous" and that in the twenty-three years she had known Lori, she had never seen her like that.

Lori went to pick up Vicki at work. Vicki testified that Lori was upset and "mad." At 4:00 p.m., Doan came to the Baker home, borrowed Lori's Honda, and loaned her the Mustang in exchange. No buyer ever came to look at the Mustang. Doan looked "awful funny" and was "real pale and quiet." At about 5:30 p.m., Lori and Vicki went to Carla's home in the Mustang. On the driver's seat was a damp sheet which Lori tossed in the back. The driver's seat was "damp." Lori again asked Carla if she had seen Carrie. When Carla told her she had not, Lori told her about Doan coming in the middle of the night smeared with blood, appellant and Doan leaving with garbage bags and a gun, appellant coming back home with blood on him, and Lori washing his clothes. Lori, Carla, and Vicki then "parted Carrie out." Carla testified that Lori was still upset and nervous. Vicki testified that Lori was "worried, very worried." As Lori went around the Mustang to leave, she noticed "a hunk of something that was bloody,"

"like a hunk of meat" adjacent to the driver's door. During the weekend of August 31 to September 1, 1996, Carla placed a call to Crime Stoppers relating what Lori had told her.

Doan returned the Honda the next morning on Friday, August 30, 1996. The car had been dirty and had a full gas tank when he borrowed it; it had now been cleaned, although it smelled of alcohol. The gas tank was empty.

Later in the afternoon, Lori went to Dee's house. While she was there, Detective Brian Edwards of the Clinton County Sheriff's Office came over and asked her when she had last seen Carrie. Lori did not convey her suspicions to the detective. On September 3, 1996, Detective Edwards interviewed Vicki. Although he gave her several opportunities to tell the truth, she denied knowing anything. Vicki testified that she denied knowing anything because she was scared. About a month later, Lori, accompanied by Vicki, met with Clinton County Sheriff Ralph Fizer in Wilmington, Ohio and told him what she had seen on the morning of Thursday, August 29, 1996. When she talked to the sheriff, Lori insisted that he be in plain clothes and in an unmarked car, and that he neither record nor take notes of their meeting. The sheriff testified that both sisters were scared.

Lawrence Baker, the father of appellant and Doan, owns a junkyard on Hunt Road in Clermont County, Ohio. The junkyard has a body of water (the "pond"). In the afternoon of September 3, 1996, two dogs searched the junkyard. Lawrence Baker was cooperative and allowed the police access to any part of the junkyard. He made, however, the comment to a sheriff deputy that "he would not put it past someone putting something on his property to get him into trouble." The first dog to search the property was a bloodhound. Bloodhounds are trained and "born bred" to follow human scent. Ben Lunsford, Jr. of the Clermont County Sheriff's Office and the bloodhound's trainer testified that "[e]veryone has an individual scent, like a fingerprint. Not one person has the same scent." The bloodhound showed a lot of interest in the pond and in fact greatly wanted to go in the water. Based upon the reaction of his dog, Lunsford opined that something that either contained a scent of Carrie or had come in contact with her person had been in and around the pond. Lunsford suggested that the pond be drained the next day.

Later that afternoon, a cadaver dog also searched the property. Cadaver dogs are trained to look for a scent of a cadaver, and pick up on the cadaver's body fluids, including blood, rather than the scent of a particular person. The cadaver dog also showed a lot of interest in the pond, swimming around and barking, and in fact kept going back to the pond. Loretta Funk of the Brown County Sheriff's Office and the cadaver dog's trainer opined that either a body or a part of a body was in the pond. However, despite the reaction of both dogs, Blanchester Police

Chief Richard Peyton declined an offer from the Clermont County Sheriff's Office to help guard the property. In fact, the property was not secured at all for the night.

The following day, on September 4, 1996, the pond was drained but nothing was found in it. However, there were footprints in the mud. It appeared that the footprints had entered into the pond from a path that led into the pond, gone out into the center of the pond, and come back out up to the path. Lunsford opined that "something went through the brush to the pond and back out * * * a couple of times maybe, or more." Lunsford and two deputies from the Clermont County and Clinton County Sheriff Offices testified that unlike the day before, their pants and shoes picked up dried mud in the area around the pond even though it had not rained.

The cadaver dog searched another property of Lawrence Baker in December 1996, a farm on Gustin Rider Road in Warren County. The dog showed a lot of interest in a sunken area with standing water in the middle of the pasture. The area was dug up but only a freezer containing spoiled deer meat was found. Loretta Funk testified that she did not know whether the area and soil around the freezer were tested. Funk testified that although this was the only time her dog had "hit [and] a body was not found, [she] still [felt that] there was something in that hole, whether it was urine, ficus [sic]. Something from a human body was in that hole besides the deer meat."

On October 10, 1996, four search warrants were executed: one on appellant, one on his house, one on his pickup truck, and one on his Peterbilt semitractor-trailer. As the search of the tractor trailer was starting, a taxi cab owned by Betty Baker, appellant's mother, arrived and a child, later identified as Christopher Baker, appellant's son, got out and asked to retrieve appellant's boots from the truck. His request was denied. At his father's trial, Christopher testified that he asked to retrieve his father's logs and checks. The police searched the truck's cab and tool box. They found a Peterbilt jacket with a stain on it and a pair of boots. Those were the boots appellant was wiping on the morning of August 29, 1996 and wearing when he left for work later that morning. As already noted, these boots had human blood that was too degraded to identify its type. The police also searched the truck's trailer by lifting the tarp and shining a flashlight inside. It was no longer daylight. The police did not physically climb into the trailer. The police did not notice anything in the trailer.

The search of appellant's house yielded no incriminating evidence. Blood stains were found on a quilt and a pillowcase but the quilt stains were consistent with appellant's DNA, whereas the pillowcase's stains did not match the DNA of appellant, Doan, or Carrie. A forensic serologist from the Miami Valley Regional Crime Laboratory assisted in the search of the house, using special equipment to

detect the presence of blood. A luminescence test indicated the presence of blood around the master bathroom sink. Further testing could not confirm the presence of blood. On November 8, 1996, appellant's house was again searched, this time for weapons. The search yielded between six and ten weapons. No body fluids or blood were found on the weapons.

Robin Eden was appellant's girlfriend from July 1996 to July 1997. Both testified that their relationship became closer as time went on. At appellant's trial, Robin testified as to several comments made by appellant relating to Carrie's disappearance and death. During their relationship, appellant told Robin that "he bet that [Sergeant] Wells wished he would have checked the back of his rig before he left town" on Thursday, August 29, 1996. Later in their relationship, Robin noticed some red paint on the side boards of appellant's tractor trailer. Robin asked appellant if it had come from Carrie's car (a red Honda). Appellant replied that it did. Another time, appellant was taking some garbage bags out of the trunk of his car[2] and appellant told Robin that "these were some of the garbage bags left over from where they had put Carrie's body." He then explained which parts of the body went into the bags. Robin testified that while they were watching a gory movie one day, appellant told her that he "liked fucking dead bodies and sticking [his] finger in the bullet hole." On another occasion, Robin was telling appellant how someone had mentioned to her that they had found a grave. Appellant replied that "[t]hey hadn't found the first grave yet."

Robin testified that appellant threatened to burn down the house of a friend of Carrie's mother because "she was running her mouth about everything." Robin also testified that following the FBI's visit several months after Carrie's disappearance, she wrote in her diary that appellant had spent the night between August 28 and 29, 1996 with her, even though this was not true. Robin added it on her own because she did not think that appellant was guilty, she later told appellant. While appellant made several comments to Robin about Carrie's disappearance, he never told her he did it. Although Robin kept asking him questions, appellant would reply that "he wasn't there, he was at [her] house that night, that he didn't do it." Robin testified that although appellant never told her he did it, by "being around him [for a year] and watching him and seeing things, [she] knew that there was something there."

Appellant and Robin stopped seeing one another in July 1997. That same month, appellant started dating Shannon Hodson. Shannon was Doan's girl-

---

2. Although Lori mostly drove the Honda while she and appellant were living together, the car apparently belonged to appellant. When he and Lori separated in October 1996, appellant kept the car.

friend from September 1996 to June or July 1997. Shannon would frequently drive appellant's car and was in fact driving it when she was arrested in December 1997. At the time, Shannon was under indictment for assisting appellant in fleeing the state of Ohio for the state of Kentucky, where appellant was eventually arrested. After being Mirandized, Shannon told Det. Edwards to look into the trunk of appellant's car because nobody had. Det. Edwards testified that Shannon kept insisting that the police look into the trunk and that she questioned why the police had not looked into it yet. The trunk was searched and a number of items, including two flannel sheets, a nylon rope, and the trunk's carpet, were sent for testing to the Miami Valley Regional Crime Laboratory. Two hairs found on the sheets were found to be consistent with hair taken from Carrie prior to her disappearance.

The circumstances leading to appellant's arrest were testified to by two Florence, Kentucky police officers as follows: On September 21, 1997, the police officers received teletype information from the Clinton County Sheriff's Office to look for appellant's tractor trailer in a truck stop in Florence. The officers located the truck at Burns Brothers Truck Stop in Florence at about 10:00 p.m. Before locating the truck, Sergeant Thomas Szurlinski noticed a gold Nissan Maxima with two people inside. While conducting surveillance of the truck, the officers noticed the Nissan Maxima pull up next to the truck. A woman, later identified as Shannon, got out of the car, placed keys on the truck's left front tire, got back into her car, and left. Soon after, she was pulled over by Sergeant Rob Bacigalupo. Shannon told Sergeant Bacigalupo that she and appellant were in Florence to pick up appellant's truck. Because they did not want the police to recognize appellant's car, they borrowed a car from an Independence, Kentucky woman for whom appellant worked. Upon seeing police officers on the parking lot of the truck stop, they left, and Shannon dropped appellant off at a nearby bar, TJ's. Sgt. Bacigalupo testified that because the location where Shannon had been pulled over was "really close to the truck stop and fairly close to the bar," she was concerned that appellant might see her talking to the officers.

The officers did not find appellant at the bar and went back to the truck stop to continue their surveillance of the truck. The following day, on September 22, 1997, at about 4:20 a.m., Sgt. Szurlinski noticed a man, later identified as appellant, walking down "the side of Kentucky 18." Upon noticing another marked police car, appellant stopped, hesitated, and eventually started running toward Interstate Highway 75. As two officers were chasing him on foot, appellant crossed the ramp to I–75 and was in a large grassy median between the ramp and the interstate when he stopped running and knelt down. Appellant offered no resistance to his arrest.

Appellant's version of his arrest slightly differed from the officers' version. Appellant testified that he simply wanted to turn himself in upon being indicted. However, the indictment was issued when his truck was in Kentucky. Because he did not want his truck to be impounded, appellant arranged for a friend, Chad Hollon, to come pick up the truck and drive it back to Ohio. Appellant was at another friend's house when he made the arrangement with Hollon over the phone. Because the friend's car was behind appellant's car, appellant and Shannon took the friend's car, went to the truck stop, and left the keys on the truck's left front tire. Later on, upon finding out that Hollon could not get to the truck until the following morning, appellant had Shannon drop him off at TJ's and recover the keys from the truck. Shannon was pulled over shortly after. When Shannon did not come back to TJ's, appellant left the bar and went back to his truck, where he sat for a long time. Appellant then called Shannon and asked her to pick him up. Shannon never came.

At that point, appellant decided to call his attorney from an outside pay phone at a gas station. Upon noticing police cars coming toward him, appellant "tried to outrun them" and started running toward I–75. Upon crossing the grassy median and realizing that there was no place for him to go, especially with "probably eight" officers chasing him, appellant stopped running, knelt down, and waited for the officers "to come up to" him.

Appellant denied seeing Doan or going anywhere with him on the night of August 28–29, 1996. Appellant stated, "I'm not saying that he didn't come over. I'm saying I don't know that he came over that night." Appellant testified that on August 28, 1996, he came home at about 11:15 p.m., took a quick shower, and went to bed. Although Lori was supposed to wake him up at about 2:30 a.m. the next morning so he could have a head start driving his truck to Chicago, Lori did not and he did not wake up until 6:25 a.m. He left for work shortly afterwards. Appellant testified that he did not find out about Carrie's disappearance until Monday, September 2, 1996. Appellant also testified that the boots removed from his truck actually belonged to Doan. Appellant denied knowing what happened to Carrie or where she was.

With regard to the statements he made to Robin regarding Carrie's disappearance, appellant either denied making them or claimed that they were taken out of context. Specifically, appellant denied making any comment about degrading dead people or threatening to burn down the house of a friend of Carrie's mother. Appellant admitted telling Robin that red paint on his truck came from Carrie's car but testified that it was said in jest as he thought they were joking around. Similarly, appellant testified that his comment about the garbage bags from his pickup truck was made in jest, as they were "just cutting up, joking[.]" On both

occasions, appellant testified saying to Robin, "Don't say that too loud now," as they were teasing one another.

Appellant admitted making the statement about the police officer looking into the back of his truck on the morning of August 29, 1996 but claimed that the comment was not made the way Shannon testified. Appellant admitted stating that he wished the officer had looked into his truck before he left for work. Similarly, appellant claimed that Shannon's statement to Det. Edwards to look into the trunk of appellant's car was misinterpreted. Appellant testified that as Shannon related the conversation to him, "she told [the officers], go ahead, go look in that car, why did you wait so long, why did you wait. If you thought something happened in that car, why did you wait so long to even look in it." When called by appellant to testify, Shannon pled the Fifth Amendment and refused to answer questions concerning her statements (1) to Kentucky police officers in September 1997, (2) made subsequent to her arrest in December 1997, and (3) regarding the trunk of appellant's car.

On June 4, 1998, a jury found appellant guilty of two counts of obstructing justice and one count of tampering with evidence. The jury, however, did not find him guilty of gross abuse of a corpse. On July 8, 1998, the trial court merged the two counts of obstructing justice. The trial court subsequently sentenced appellant to a four-year term of imprisonment on the obstructing justice charge and to a consecutive four-year term of imprisonment on the tampering with evidence charge. This appeal follows, in which appellant raises seven assignments of error.

In his first assignment of error, appellant argues that the trial court erred in overruling his March 30, 1998 motion to dismiss the indictment against him. Appellant argues that the indictment was fatally tainted because it was obtained through Lori's testimony in violation of the spousal privilege as set forth in R.C. 2945.42 (this privilege is discussed under appellant's second assignment of error).

■ The Ohio Rules of Evidence do not apply to proceedings before grand juries, other than with respect to privileges. Evid.R. 101(C)(2). Pursuant to the spousal privilege, a spouse cannot testify regarding a communication made by one to the other or an act done by either in the presence of the other, during coverture, unless the communication was made or the act done in the presence or hearing of a third person competent to be a witness. R.C. 2945.42.

■ "Under the United States and Ohio Constitutions, an individual accused of a felony is entitled to an indictment setting forth the 'nature and cause of the accusation.' * * * '[A]n indictment is generally sufficient if it contains, in substance, a statement that the accused has committed some public offense

therein specified.' " *State v. Marshall* (Apr. 29, 1991), Clinton App. No. CA90–04–010, unreported, at 4, 1991 WL 69356.

"Traditionally the grand jury has been accorded wide latitude to inquire into violations of criminal law. * * * The grand jury's investigative power must be broad if its public responsibility is adequately to be discharged." *State v. Crist* (Oct. 20, 1997), Butler App. No. CA96–08–159, unreported, at 9, 1997 WL 656307. "The grand jury's sources of information are widely drawn, and the validity of an indictment is not affected by the character of the evidence considered. Thus, an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence * * * or even on the basis of information obtained in violation of a defendant's Fifth Amendment privilege against self-incrimination." *United States v. Calandra* (1974), 414 U.S. 338, 344–345, 94 S.Ct. 613, 618, 38 L.Ed.2d 561, 569.

"Of course, the grand jury's subpoena power is not unlimited. It may consider incompetent evidence, but it may not itself violate a valid privilege, whether established by the Constitution, statutes, or the common law. * * * Although, for example, an indictment based on evidence obtained in violation of a defendant's Fifth Amendment privilege is nevertheless valid, * * * the grand jury may not force a witness to answer questions in violation of that constitutional guarantee." *Id.* at 346, 94 S.Ct. at 619, 38 L.Ed.2d at 570.

In his motion to suppress the indictment, appellant alleged that Lori was his common-law wife (appellant and Lori were divorced in 1985 but lived together from 1987 to 1996). The state asked the trial court to assume, "in looking at the Grand Jury transcript and in ruling with regard to the spousal privilege issue[,]" that appellant and Lori were married. The trial court never specifically made a finding about common-law marriage.

We find that the indictment and subsequent proceedings based thereon are not invalid. "In order to defeat a grand jury indictment based on the grand jury's exposure to inappropriate information, [appellant] would have been required to show that the grand jury lacked other non-privileged testimony that could have formed the basis for the indictments." *Smith v. Sumner* (Mar. 24, 1988), C.A.9 No. 87–1500, unreported, 1988 WL 26628, citing *United States v. Bracy* (C.A.9, 1977), 566 F.2d 649. In its May 20, 1998 judgment entry denying appellant's motion to dismiss the indictment, the trial court stated that "[t]he Court had the opportunity to review a transcript of the Grand Jury testimony of [Lori] before the Grand Jury. The Court is also aware that this testimony was only a part of the overall testimony presented before the Grand Jury which indicted [appellant]." Appellant has not demonstrated that the grand jury lacked

another basis for the decision to indict him. Without a transcript of the grand jury proceedings before us, we are reluctant to second-guess the trial court's decision to deny appellant's motion to dismiss in light of the overall testimony presented before the grand jury. See, also, *United States v. Estes* (C.A.2, 1986), 793 F.2d 465 (absent prosecutorial misconduct, the mere fact that some incompetent or privileged testimony is heard by a legally constituted and unbiased grand jury seldom will invalidate an indictment returned by it).

In the case at bar, the indictment, as returned by the Clinton County Grand Jury, was valid on its face. It was sufficient to state a violation of the criminal laws of the state of Ohio, and was therefore enough to call appellant for trial of the charges on their merits. We therefore find that the trial court did not err in denying appellant's motion to dismiss the indictment. Appellant's first assignment of error is overruled.

In his second assignment of error, appellant argues that the trial court erred by allowing Lori to testify at his trial in violation of the spousal privilege as set forth in R.C. 2945.42. On March 30, 1998, appellant filed a motion to suppress privileged testimony in which he argued that allowing Lori to testify at his trial would violate the spousal privilege. By judgment entry filed May 18, 1998 (the first day of trial), the trial court stated that "[appellant] claims that he and Lori Baker are married and that he intends to assert his spousal privilege pursuant to R.C. 2945.42[.] * * * The Court will rule on each issue of spousal privilege as it is presented during the course of the trial." During trial, and after overruling appellant's objections, the trial court allowed Lori to testify as to the events on the morning of August 29, 1996 and her communications with appellant that morning.

In his motion to suppress, appellant alleged that he and Lori had a common-law marriage. Although the state asked the trial court to assume the existence of a common-law marriage for purposes of the motion, the trial court never specifically made a finding about common-law marriage, nor did it conduct an evidentiary hearing on the issue.

Evid.R. 601 governs a spouse's competency to testify against the other spouse in a criminal case and provides that "[e]very person is competent to be a witness except * * * [a] spouse testifying against the other spouse charged with a crime except when * * * the testifying spouse elects to testify." Evid.R. 601(B)(2). "'[A] defendant's spouse is incompetent to testify against the defendant absent an indication in the record that the testifying spouse was made aware of his or her right not to testify and that he or she made a knowing and voluntary election to waive that right.'" *State v. Payton* (Aug. 8, 1994), Fayette App. No. CA93–12–028, unreported, at 8, 1994 WL 409621. The record clearly shows that after Lori was made aware of her right not to testify against appellant, she

nevertheless elected to waive that right. Thus, even assuming that Lori was appellant's common-law wife, she was competent to testify against him under Evid.R. 601.

However, "although a spouse may be competent to testify in a criminal trial, R.C. 2945.42 confers a substantive right upon the accused to exclude privileged spousal testimony concerning a confidential communication made or act done during coverture unless a third person was present or one of the other specifically enumerated exceptions contained in the statute is applicable." *State v. Rahman* (1986), 23 Ohio St.3d 146, 149, 23 OBR 315, 317, 492 N.E.2d 401, 405.

R.C. 2945.42 classifies as privileged certain marital communications and acts and provides that "[h]usband or wife shall not testify concerning a communication made by one to the other, or act done by either in the presence of the other, during coverture, unless the communication was made or act done in the known presence or hearing of a third person competent to be a witness."

R.C. 2945.42 specifically states that privileged communications between spouses take place "during coverture." Coverture is defined as "the condition or state of a married person, whether man or woman." *Bentleyville v. Pisani* (1995), 100 Ohio App.3d 515, 517, 654 N.E.2d 394, 396. "Where evidence shows that incidents of coverture have been relinquished, no legitimate purpose would be served by the exclusion of spousal testimony. * * * Absent coverture, a communication between spouses is not privileged." *Id.* at 518, 654 N.E.2d at 396.

After thoroughly reviewing the entire record, we find that appellant's acts and statements on the morning of August 29, 1996 were not made during coverture, as the evidence does not show the existence of coverture. It is undisputed that appellant and Lori were divorced in 1985 and that they never remarried one another. Although appellant and Lori were living together at the time of Carrie's disappearance, they both were involved in relationships with others. Appellant, especially, was seeing his girlfriend as often as he could and slept at her house many times when he was not on the road. She, in turn, would go with him in his truck from time to time.

Following appellant's arrest, Lori filed a divorce complaint against appellant. Lori testified that as far as she was concerned, she and appellant were living together as husband and wife from 1987 on. When appellant was served with the divorce complaint, he stated that he "didn't need those [as he] had already gotten a divorce * * * in 1985." Appellant admitted that his answer stated he was married to Lori after his attorney advised him to do so. A deed signed by appellant, after he had been served with the divorce complaint, which transferred his house to his parents referred to appellant as "a single man" four times and

stated in relevant part that "[a]lthough some references have shown Tracey Baker as a married man (married to Lori J. Baker), the parties were, in fact, divorced June 24, 1985 in Clinton County * * *. Tracey Baker has remained an unmarried man since the Entry of the Divorce Decree."

It is clear that although living together, appellant and Lori were not living in coverture at the time of Carrie's disappearance, and thus the spousal privilege does not apply. As a result, the trial court did not err in allowing Lori to testify at appellant's trial as to appellant's acts and statements on the morning of August 29, 1996. Appellant's second assignment of error is overruled.

In his third assignment of error, appellant argues that the trial court erred by allowing Vicki and Carla to testify about three hearsay statements Lori made to Vicki and/or Carla regarding the events that took place at the Baker home in the early morning hours of August 29, 1996. Appellant contends that these hearsay statements were not "excited utterances" under Evid.R. 803(2). After overruling appellant's objections, the trial court found these statements were admissible.

The trial court has broad discretion in determining whether relevant evidence can be admitted. *State v. Goodson* (May 10, 1999), Preble App. Nos. CA98–07–008 and CA98–08–013, unreported, at 9, 1999 WL 298072, citing *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of syllabus. Absent an abuse of discretion and a showing of material prejudice, a trial court's ruling on the admissibility of evidence will be upheld. *Goodson,* citing *State v. Martin* (1985), 19 Ohio St.3d 122, 129, 19 OBR 330, 336, 483 N.E.2d 1157, 1164.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C): Hearsay is generally not admissible in evidence unless the evidence meets one of the recognized exceptions to the hearsay rule. Evid.R. 802. Evid.R. 803(2) allows the admission of hearsay under the "excited utterance" exception, which is defined as:

"A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

An excited utterance is one in which the declarant was under the excitement of a startling event and, therefore, the statement was not the product of reflection. *State v. Taylor* (1993), 66 Ohio St.3d 295, 300, 612 N.E.2d 316, 320. The Supreme Court of Ohio has stated:

"There is no *per se* amount of time [between the occurrence and the statement] after which a statement can no longer be considered to be an excited utterance. The central requirements are that the statement must be made while

the declarant is still under the stress of the event and the statement may *not* be a result of reflective thought. [Emphasis *sic.*]

"Therefore the passage of time between the statement and the event is relevant but not dispositive of the question." *Id.* at 303, 612 N.E.2d at 322.

 Lori was awakened at 3:17 a.m. on August 29, 1996 when Doan, smeared with blood, came to the Baker home and asked for his half-brother. About one-half hour later, the two half-brothers left with seven garbage bags and a gun. Vicki first testified to what Lori told her that same morning while en route to Vicki's work. It was then between 4:45 a.m. and 5:00 a.m. Vicki testified that Lori told her about the two half-brothers leaving with garbage bags and a gun. Vicki testified that she had never seen her sister "nervous and scared and upset like that before." We find this statement admissible as an excited utterance, as Lori was clearly still under the influence of the event.

 With regard to the other two statements, we note at the outset that the mere fact they were made several hours after the events and after Lori went about her day does not automatically disqualify them as admissible excited utterances. "The fact that the statements were not contemporaneous with the accident does not take it out of the excited utterance exception." *Warfield v. Greater Cleveland Regional Transit Auth.* (July 7, 1988), Cuyahoga App. No. 54023, unreported, 1988 WL 87653.

Carla testified to what Lori first told her when both women were picking up their children at school during the early afternoon that same day. After Carla told Lori that she had not seen Carrie, Lori told her that she thought Doan had killed Carrie and that appellant had helped him. Carla, who had been Lori's best friend until that summer, testified that Lori was "very upset, nervous" and that in the twenty-three years she had known Lori, she had never seen her like that. By then, Lori had seen appellant come back with blood on his person, had washed appellant's bloody clothes, and had seen Doan again at 10:00 a.m. as she was leaving the tanning booth. Under these circumstances, we find that Lori was still in a "state of nervous excitement." *Taylor,* 66 Ohio St.3d at 304, 612 N.E.2d at 323. Based upon our standard of review, we find this statement admissible as an excited utterance.

 Vicki and Carla both testified to what Lori told Carla at Carla's house at or about 5:30 p.m. that day. By then, Lori had seen Doan again when he came to her house at 4:00 p.m. to borrow her car. After Carla again told Lori that she had not seen Carrie, Lori told her about Doan coming in the middle of the night smeared with blood, appellant and Doan leaving with garbage bags and a gun, appellant coming back with blood on his person, and Lori washing his bloody clothes. Carla testified that Lori was still upset and nervous. Vicki testified that

Lori was "worried, very worried." Considering our deferential standard of review, we also find this statement admissible as an excited utterance. See *State v. Doan* (Feb. 28, 2000), Clinton App. No. CA97–12–014, unreported, 2000 WL 221963 (holding that Carrie's statement to her best friend about the scratches inflicted by Doan the day after the incident was admissible excited utterance).

In light of the foregoing, we find that the trial court did not abuse its discretion in allowing the testimony of Vicki and Carla. Appellant's third assignment of error is overruled.

In his fourth assignment of error, appellant argues that the trial court erred by admitting into evidence a document indicating that appellant was a drug-dependent person. Appellant argues that the state improperly used the document to impeach him in violation of Evid.R. 607, 608, and 613.

An October 6, 1996 search of appellant's pickup truck yielded steroids, testosterone, and hypodermic needles. Appellant was subsequently indicted as a result of that search. At trial, on cross-examination, appellant denied that he was drug-dependent, in danger of being drug-dependent, or in need of treatment for drug dependency in November 1996. Following appellant's denial, the state introduced state's exhibit 46, an application for treatment in lieu of conviction, which was filed in November 1996 by appellant's then-attorney, John Rion. The document, which is signed by Rion only, states that "[n]ow comes * * * TRACEY BAKER, by and through his attorneys, * * * and states that he is a drug dependent person, or is in danger of becoming a drug dependent person, his drug dependency was a factor leading to the activity with which Defendant is charged, and rehabilitation through treatment would substantially reduce the likelihood of additional criminal activity."

Appellant testified that while he was then represented by Rion, he had never seen the document. Appellant stated that Rion was "evidently" authorized to file the document on his behalf. At the end of trial, after both the state and the defense attorney argued as to the admissibility of the document, the trial court admitted it without explanation.

Appellant argues that the document was inadmissible under Evid.R. 607(A), 608(B),[3] or 613(B). Evid.R. 607(A) provides that "[t]he credibility of a

---

**3.** Evid.R. 608(B) governs the use of specific instances of conduct and provides that specific instances of a witness's conduct "for the purpose of attacking * * * the witness's character for truthfulness, other than conviction of crime as provided in Evid.R. 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if clearly probative of * * * untruthfulness, be inquired into on cross-examination of the witness * * *." The language of this rule is very clear. "[A] witness' credibility may not be impeached by extrinsic proof of specific instances of his conduct. Such conduct may be inquired into only by the intrinsic means of cross-examination[.]" *State v. Kamel* (1984), 12 Ohio St.3d 306, 12 OBR

witness may be attacked by any party except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage."

Evid.R. 613 was amended effective July 1, 1998. However, our decision is governed by the former version of Evid.R. 613, which was in effect at the time of appellant's trial of May 18 to June 4, 1998. Former Evid.R. 613(B) provided that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded a prior opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in Rule 801(D)(2)."

We disagree at the outset with appellant's assertion that Evid.R. 607(A) allows the use of prior inconsistent statements only against one's own witness as a result of surprise and affirmative damage. "Under pre-Rule Ohio law, a party was always permitted to impeach the credibility of an opposing party's witness, but was never permitted to impeach his own witness by any means. This common law doctrine [was] known as the 'voucher rule' * * *. Ohio Rule 607 partially abandons the voucher rule. Under Rule 607 a party may * * * impeach his own witness with a prior inconsistent statement only where the party is surprised and damaged by his witness's trial testimony." Weissenberger's Ohio Evidence (1998) 225–226, Section 607.1.

We find that the document was properly admitted under either former Evid.R. 613(B) or 801(D)(2). Former Evid.R. 613(B) permits the introduction of prior inconsistent statements as long as the witness is afforded a prior opportunity to explain or deny the statements. To introduce a witness's prior inconsistent statements under that rule, the proper foundation must be laid. A proper foundation is laid when the witness denies making the prior statement. *State v. Riggins* (1986), 35 Ohio App.3d 1, 3, 519 N.E.2d 397, 401–402. In *State v. Marsh* (Sept. 30, 1985), Warren App. No. CA84–11–080, unreported, 1985 WL 7752, we stated that if the witness "claims a lack of memory or lack of knowledge about events described in a prior statement, the prior statement is considered inconsistent and is therefore admissible." *Id.* at 10.

In *Marsh*, the witness testified that she had never seen the defendant do anything to his baby (the defendant was being tried for the murder of his infant daughter). The state attempted to impeach the witness with her prior written statement, but the witness indicated that she did not remember the statement.

378, 466 N.E.2d 860, paragraph two of the syllabus. We therefore agree with appellant that the document is inadmissible under Evid.R. 608(B).

The state then proceeded to read parts of the statement to the witness and ask her questions about them. This court stated that the witness's prior statement was used for impeachment purposes and that in light of a claimed lack of memory or knowledge, the prior statement was inconsistent and therefore admissible. *Id.* This court then went on to consider whether the trial court's admission of the statement into evidence was erroneous. Finding that it was not, this court stated:

"The admission of evidence pertaining to a collateral issue that is only pertinent with respect to the credibility of a witness's testimony is a matter within the sound discretion of the trial court, and will not be reversed on appeal unless it appears that, on the facts of the particular case, the defendant was thereby denied a fair trial. * * * In the case sub judice, [the witness'] prior statement was admissible for purposes of proving that the prior inconsistent statements were in fact made. * * * Further, it does not appear that appellant was prejudiced by the admission of the statement * * *." *Id.* at 10–11.

Based upon our deferential standard of review and in light of former Evid.R. 613(B) and our decision in *Marsh,* we find that the trial court did not abuse its discretion by admitting into evidence appellant's application for treatment in lieu of conviction. Alternatively, we find that the admission was also proper under Evid.R. 801(D)(2).

Former Evid.R. 613(B) specifically provided that it was not applicable to "admissions of a party-opponent as defined in Rule 801(D)(2)." "Evid.R. 801(D)(2) defines an admission as a statement of a party offered against that party." *State v. Thompson* (1993), 87 Ohio App.3d 570, 577, 622 N.E.2d 735, 739. "While the term 'admission' appears to imply that the out-of-court statement must be a confession or statement against interest, in actuality, any prior statement of a party is admissible providing it is offered against the party at trial." Weissenberger's Ohio Evidence (1998) 367, Section 801.33.

■ Evid.R. 801(D)(2) provides that a statement is an admission by a party-opponent if the "statement is offered against a party and is (a) his own statement, * * * or (c) a statement by a person authorized by him to make a statement concerning the subject, or (d) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship * * *." "'The statements of a [party-opponent] are admitted upon a different principle from that which governs [prior inconsistent statements]. Such statements are admissions and provable by independent testimony; no foundation is necessary for their introduction as evidence, except some proof that they were made by the party.'" *Thompson* at 577, 622 N.E.2d at 740.

In the case at bar, the application for treatment in lieu of conviction was filed and signed by appellant's then-attorney. While appellant denied ever seeing the document, he testified that his attorney was "evidently" authorized to file it. The document was offered against him at trial, and, "therefore, it was not necessary that [it] be inconsistent with his testimony at trial nor were the foundation requirements of Evid.R. 613(B) applicable to [it]." *Id.* at 578, 622 N.E.2d at 740. We therefore find that the document was admissible as a party admission, regardless of whether it was admissible as a prior inconsistent statement. *Id.* Appellant's fourth assignment of error is overruled.

In his fifth assignment of error, appellant argues that the trial court erred in allowing, over objection, the two Kentucky police officers to testify about Shannon's statements to them regarding her and appellant's plan to retrieve appellant's truck from Kentucky and drive it back to Ohio without being detected by police. At trial, the state argued that Shannon was a co-conspirator, that the testimony was designed to show a course of conduct, and that it was not offered to prove the truth of the matter asserted. The trial court overruled appellant's objection without explanation. Appellant contends that the statements were hearsay and inadmissible as co-conspirator statements under Evid.R. 801(D)(2)(e).

Evid.R. 801(D)(2)(e) provides that "[a] statement is not hearsay if * * * [it] is offered against a party and is * * * a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy." "An out-of-court declaration by a co-conspirator is admissible against the defendant upon proof: (1) of the existence of a conspiracy; (2) of the defendant's participation in the conspiracy; (3) of the declarant's participation in the conspiracy; (4) that the statement was made during the course of the conspiracy; and (5) that the statement was made in furtherance of the conspiracy." *State v. Bishop* (Oct. 5, 1998), Madison App. No. CA97–07–032, unreported, at 21, 1998 WL 684486. "The party seeking to introduce the co-conspirator's statement must independently prove that a conspiracy existed by evidence other than the hearsay statement." *Id.*

We agree with appellant that Shannon's statements to the police officers were inadmissible as co-conspirator statements. Evid.R. 801(D)(2)(e) clearly requires independent proof of a conspiracy before a co-conspirator statement may be introduced and "precludes the finding that the statement itself may be used to establish the existence of the conspiracy." *State v. Carter* (1995), 72 Ohio St.3d 545, 550, 651 N.E.2d 965, 972. The record clearly shows that the state failed to independently establish the existence of the alleged conspiracy. As a result, Shannon's statements were not admissible under Evid.R. 801(D)(2)(e).

We find, however, that they were admissible as statements against interest under Evid.R. 804(B)(3).

Evid.R. 804(B)(3) provides an exception to the hearsay rule when the declarant is unavailable and provides:

"A statement that was at the time of its making so far contrary to the declarant's pecuniary or propriety interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true. A statement tending to expose the declarant to criminal liability, whether offered to exculpate or inculpate the accused, is not admissible unless corroborating circumstances clearly indicate the truthworthiness of the statement."

Thus, to be admissible as a statement against interest under Evid.R. 804(B)(3), the statement must have been made by an unavailable declarant as defined in Evid.R. 804(A), and the statement must be contrary to a pecuniary, proprietary, or penal interest at the time of its utterance. In addition, when the statement is one against penal interest, which either exculpates or inculpates the accused in a criminal trial, there must be corroboration tending to guarantee the statement's trustworthiness.

At trial, appellant called Shannon to testify, but she asserted her Fifth Amendment right against self-incrimination and refused to testify. By doing so, Shannon became "unavailable" pursuant to Evid.R. 804(A)(1), which provides that a declarant is unavailable when the declarant is "exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the [declarant]." See *State v. Sumlin* (1994), 69 Ohio St.3d 105, 108, 630 N.E.2d 681, 683.

Shannon's statements to the police officers clearly tended to subject her to criminal liability, as they tended to show she was helping appellant, who was by then under indictment, to avoid detection by police and retrieve his truck and drive it back to Ohio. Indeed, at the time of appellant's trial, Shannon herself was under indictment for obstruction of justice. Shannon's statements exposed her to criminal liability and were thus against her penal interest.

Finally, corroborating circumstances indicate the trustworthiness of Shannon's statements. The evidence shows no discussion of any promises or offers in exchange for the statements. The evidence rather shows that Shannon's statements to the officers were spontaneous. In addition, the content of Shannon's statements was corroborated by none other than appellant. At trial, appellant agreed that before he was arrested in Kentucky, he was trying to get his truck back to Ohio so that it would not be impounded. While appellant's version of the

events leading to his arrest differed from the arresting officers' version, it nevertheless clearly showed that appellant was trying to get his truck back to Ohio without being detected by police. His own testimony clearly indicated that while he had several opportunities to surrender to police, he did not do so until after he unsuccessfully "tried to outrun them" and realized there was no place to go.

We therefore find that Shannon's statements were admissible as statements against interest under Evid.R. 804(B)(3). As a result, the trial court did not abuse its discretion in allowing the police officers to testify about them. Appellant's fifth assignment of error is overruled.

In his sixth assignment of error, appellant argues that the trial court erred by refusing to merge the two counts of obstructing justice (which were merged by the trial court on July 8, 1998) with the count of tampering with evidence. Appellant contends that under the test set forth in *Newark v. Vazirani* (1990), 48 Ohio St.3d 81, 549 N.E.2d 520, overruled in *State v. Rance* (1999), 85 Ohio St.3d 632, 710 N.E.2d 699, paragraph one of the syllabus, the offenses were allied offenses of similar import and, thus, he should have been convicted of only one offense.

Allied offenses of similar import are governed by R.C. 2941.25, which provides:

"(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

"(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."

In *Rance,* the Supreme Court of Ohio recently reconsidered the issue of how to apply R.C. 2941.25 when determining whether two or more offenses constitute allied offenses of similar import. Prior to *Rance,* the test used by the courts was that set forth in *Vazirani,* in which the court compared the elements of the two crimes charged by reference to the particular facts alleged in the indictment. In *Rance,* the Supreme Court reconsidered whether the elements test should be conducted in terms of the facts of the specific case or in terms of the statutory elements of the offenses in the abstract. The Supreme Court ruled that an analysis of the elements in the abstract was proper, overruling *Vazirani* and language to the contrary in other cases. *Rance,* 85 Ohio St.3d at 638, 710 N.E.2d at 704–705.

█ As a result, when determining whether two or more offenses are allied offenses of similar import, "[c]ourts should assess, by aligning the elements of each crime in the abstract, whether the statutory elements of the crimes 'correspond to such a degree that the commission of one crime will result in the commission of the other.' * * * And if the elements do so correspond, the defendant may not be convicted of both unless the court finds that the defendant committed the crimes separately or with separate animus." *Id.* at 638–639, 710 N.E.2d at 705.

Appellant was convicted of obstruction of justice in violation of R.C. 2921.32(A)(2) and (4) and tampering with evidence in violation of R.C. 2921.12(A)(1). R.C. 2921.32(A) provides that "[n]o person, with purpose to hinder the discovery, apprehension, prosecution, conviction, or punishment of another for crime or to assist another to benefit from the commission of a crime * * * shall * * * (2) [p]rovide the other person * * * with money, transportation, a weapon, a disguise, or other means of avoiding discovery or apprehension; * * * [or] (4) [d]estroy or conceal physical evidence of the crime or act * * *." R.C. 2921.12(A)(1) in turn provides that no person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall "[a]lter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation."

We note at the outset that a few appellate districts have found that the offenses of obstructing justice and tampering with evidence are allied offenses of similar import. Their holdings were, however, based upon the test set forth in *Vazirani* and the specific phrasing of the indictment at bar. See, *e.g., State v. Brooks* (Jan. 10, 1997), Montgomery App. No. 15797, unreported, 1997 WL 7136; *State v. Daniel* (June 10, 1996), Fairfield App. No. 95 CA 33, unreported, 1996 WL 362895. We have not found any cases dealing with this issue in the abstract as it is now required under *Rance.*

█ The offenses of obstructing justice under R.C. 2921.32(A)(2) and tampering with evidence under R.C. 2921.12(A)(1) are clearly not allied offenses of similar import, as the offenses contain dissimilar elements. While tampering with evidence requires the offender to alter, destroy, or conceal a *thing,* obstructing justice requires the offender to provide *another person* with money, transportation, a weapon, or a disguise specifically to help that other person in avoiding discovery or apprehension. Thus, the statutory elements of R.C. 2921.32(A)(2) and 2921.12(A)(1) do not correspond to such a degree that the commission of one crime will result in the commission of the other.

█ Appellant maintains with some persuasiveness that R.C. 2921.32(A)(4) and 2921.12(A)(1) contain similar elements. However, after looking at the

elements of each crime in the abstract, we find that these offenses are not allied offenses of similar import. It is undisputed that both R.C. 2921.12(A)(1) and 2921.32(A)(4) involve the destruction or concealment of evidence. However, tampering with evidence also includes the alteration of evidence, which obstructing justice does not. Tampering with evidence also clearly requires the offender to know that an official proceeding or investigation is either in progress or likely to be instituted. No such knowledge is required for obstructing justice. The offender's purpose for destroying or concealing evidence is also very different. Tampering with evidence requires the offender to destroy or conceal evidence for the very purpose of impairing its value or availability as evidence in the official proceeding or investigation. Obstructing justice, on the other hand, requires the offender to destroy or conceal evidence for the specific purpose of either assisting another person to benefit from the crime or hindering the discovery, apprehension, prosecution, conviction, or punishment of that other person. Finally, when it comes to the evidence being destroyed or concealed, one offense is very specific while the other is general in nature: under R.C. 2921.32(A)(4)(obstructing justice), the evidence must be the physical evidence of the crime, whereas the evidence under R.C. 2921.12(A)(1) (tampering with evidence) is any record, document, or thing. We therefore find that the elements of R.C. 2921.32(A)(4) and 2921.12(A)(1) do not correspond to such a degree that the commission of one crime will result in the commission of the other.

The offenses of tampering with evidence and obstructing justice are therefore not allied offenses of similar import and appellant's conviction for both offenses did not violate R.C. 2941.25. Appellant's sixth assignment of error is overruled.

In his seventh assignment of error, appellant argues that the cumulative effect of the errors asserted in his first six assignments of error deprived him of a fair trial. In light of our dispositions of the first six assignments of error, we fail to see how the absence of prejudicial error can rise to the level of cumulative error, *State v. Moreland* (1990), 50 Ohio St.3d 58, 69, 552 N.E.2d 894, 905, and therefore find no merit to this assignment of error. Appellant's seventh assignment of error is overruled.

*Judgment affirmed.*

POWELL, P.J., and WILLIAM W. YOUNG, J., concur.