OPINION
Defendant-appellant, Michael Lamberson, appeals his convictions, sentences, and adjudication as a sexual predator in the Madison County Court of Common Pleas.
In the early morning hours of July 22, 1999, E.H., a seventy-five-year-old woman, called the London Police Department and reported a prowler outside her apartment in Metro Court in London, Ohio. As a result, Sergeant David Wiseman drove by E.H.'s apartment and saw no evidence of a break-in. However, Sgt. Wiseman observed eighteen-year-old Lamberson sitting in a nearby yard, within one hundred yards of E.H.'s apartment. The police knew of Lamberson due to his extensive juvenile record.
In the early morning hours of July 23, 1999, E.H. called the police to report that a young black man broke into her apartment and forcibly raped her at knifepoint. Officer Michael Albright responded and drove E.H. to the Madison County Hospital where she received treatment for her injuries, and where a "rape kit" examination was performed. Afterwards, E.H. gave a statement to the police. According to E.H., the young man gained entrance into her apartment through a door she had left unlocked after discovering her dog was missing. E.H. described the man as a black male, approximately twenty years old, five feet six inches to five feet ten inches tall, clean shaven with a corn row (plates or tiny braids) hairstyle, and wearing shorts with a belt and no shirt. She did not observe any tattoos or scars. However, E.H. was unable to identify her assailant from photo arrays containing Lamberson's picture.
Sergeant David Litchfield considered Lamberson and Chad Lett suspects in this case based upon police reports that they both had been seen near E.H.'s apartment when she reported a prowler, and because they both fit the physical description of the assailant. During the investigation, Lamberson gave the police saliva samples on two separate occasions. On July 27, 1999, Sgt. Litchfield obtained saliva samples from both Lamberson and Lett without a warrant. These samples and the rape kit were taken to the Ohio Bureau of Criminal Identification and Investigation ("BCII") in London, Ohio for a deoxyribonucleic acid ("DNA") analysis.
Unsure that Lamberson's saliva sample was sufficient for testing, BCII recommended another saliva sample be collected. Several days later, Sgt. Litchfield encountered Lamberson on the street and asked him for another saliva sample. Lamberson refused, but on August 17, 1999, Lamberson provided a second saliva sample after signing a permission to search form following an arrest for domestic violence. The consent form authorized the police to obtain a saliva sample without a warrant as "evidence for criminal prosecution in the case or cases currently under investigation." This sample was never sent to BCII because the first sample was sufficient for testing.
The DNA results excluded Lett as the assailant. However, the results revealed that the DNA in Lamberson's saliva sample was an identical match with the DNA in the semen recovered from E.H.'s skin. Based upon the DNA results, Sgt. Litchfield arrested Lamberson and subsequently a grand jury indicted him on one count of aggravated burglary in violation of R.C.2911.11(A)(1) and one count of rape in violation of R.C. 2907.02(A)(2). Lamberson entered a plea of not guilty and moved to suppress evidence of all bodily fluids (saliva samples) and any evidence derived therefrom that the state obtained from him without a warrant. After a hearing, the trial court found that the police obtained the saliva sample under the consent exception to the warrant requirement and denied the motion.
The matter proceeded to a jury trial. At trial, E.H. testified and made an in-courtroom identification of Lamberson on direct examination. According to E.H., she had let her dog outside to go to the bathroom. The dog was on a leash attached to a chain link pen inside the apartment. When she opened the back door to let the dog inside, the dog and leash were missing. After returning inside from looking for the dog, E.H. sat down in a chair to call the police when Lamberson "rushed in the back door and straddled her." Lamberson placed his hands over her mouth and cut the phone wires. He told E.H. to get on the floor and take her pants off. As E.H. tried to push Lamberson off of her, he threatened her with a knife held against her throat and slapped her across the face when she screamed. Lamberson proceeded to place his fingers in her vagina and then penetrated her vagina with his penis. Afterwards, he left and came back with the dog and the leash. Before leaving again, Lamberson wiped the door handles off to both the front and back doors of the apartment.
The state presented additional witnesses who testified regarding the collection, handling, and/or the DNA analysis of the rape kit and saliva samples over numerous objections by Lamberson. This testimony included Dr. Alfonso Reyes, the emergency room physician, and Nurse Paula Brown, a registered nurse, at Madison County Hospital. Dr. Reyes stated that E.H.'s injuries included bruises on her face, and vaginal lacerations and swelling. Dr. Reyes and Nurse Brown collected various samples during their examination of E.H. for the rape kit. These samples included oral smears, oral swabs, vaginal swabs, rectal swabs, thigh skin stain swabs, and a blood specimen from E.H.
Margaret Saupe, a forensic scientist with BCII, testified that she found semen in the vaginal, rectal, and thigh skin swabs from the rape kit. Jennifer Duvall, a forensic scientist with BCII, testified that she performed the DNA analysis, which revealed the DNA banding pattern found in Lamberson's saliva sample was identical to the DNA banding pattern found in the semen recovered from a stain on E.H.'s skin. She also stated that the statistical probability of another individual having the same DNA banding pattern as that found in the semen recovered from E.H.'s skin was one in two hundred and two quadrillion Caucasians and one in nine hundred and nine quadrillion African-Americans.
Lamberson took the stand and presented an alibi defense. According to Lamberson, he had spent the night with his girlfriend, Elizabeth Hoosier, at her residence. Elizabeth, who is the mother of Lamberson's son and pregnant with their second child, lives next door to her parents, Kathy and Gerald Hoosier. Their residences are located on Vernon Avenue, which are within one hundred yards of E.H.'s apartment. Elizabeth and Kathy corroborated Lamberson's alibi. The state attempted to impeach these statements with evidence that they did not come forward with their information while Lamberson remained in jail for thirty-five days after being arrested for these offenses.
The defense also introduced the police report to show that E.H. described her assailant as clean-shaven and without any tattoos. Gerald Hoosier testified that Lamberson had a beard and mustache on the day of the offenses. A picture of Lamberson taken several days after the incident on July 27, 1999 shows Lamberson with a light growth of facial hair. The state stipulated to the fact that Lamberson had received a colorful tattoo on his arm prior to the date of the incident.
Lamberson made an oral motion to suppress E.H.'s in-courtroom identification. Lamberson claimed that E.H.'s identification of him was tainted because she had seen him in the hallway before she testified. The trial court heard arguments outside the presence of jury and overruled the motion.
The defense also called William Hatfield, an investigator with BCII, who testified that he discovered a broken window and window screen at E.H.'s apartment and lifted several fingerprints. The fingerprints did not belong to Lamberson or Lett. However, Hatfield testified it was unlikely the assailant gained entry through the window. The window was eleven inches by sixteen inches.
The jury found Lamberson guilty of aggravated burglary and rape. The trial court ordered a presentence investigative report, which detailed Lamberson's delinquencies for unauthorized use of a motor vehicle, unruly for curfew violations, aggravated trespass, robbery and three assaults from October 1996 through November 1998. By its March 23, 2000 entry, the trial court determined that Lamberson is a sexual predator and sentenced him to two ten-year prison terms and ordered the sentences to be served consecutively. Lamberson appeals raising five assignments of error.
Assignment of Error No. 1:
 THE TRIAL COURT ERRED IN FAILING TO GRANT APPELLANT'S MOTION TO SUPPRESS THE DNA EVIDENCE SEIZED WITHOUT WARRANT FROM APPELLANT.
In his first assignment of error, Lamberson contends that the trial court erred by not suppressing the DNA evidence from his first saliva sample obtained by the police without a warrant.
At the suppression hearing, the state presented the testimony of several London police officers about the circumstances surrounding the collection of the first saliva sample from Lamberson. Sgt. Litchfield told other officers in the police department that he wanted to talk with both Lamberson and Lett because he considered them suspects in this case.
While on patrol, at approximately 6:07 p.m. on July 27, 1999, Officer David Williamson observed Lamberson and Lett near the Mug and Brush Barbershop on South Main Street. The Mug and Brush is about one to one and one-half blocks from the police station. Officer Williamson made a u-turn and stopped his cruiser approximately ten to twelve feet from Lamberson and Lett. Officer Williamson notified Sgt. Litchfield that he had located the two suspects. According to Williamson, he approached Lamberson and Lett and said: "[d]o you guys mind standing by, Sgt. Litchfield needs to talk to you guys?" After Lamberson and Lett asked him what it was about, Williamson told them that "their names had come up as suspects in recent crimes and Litchfield needed to talk to them, if they didn't mind standing by" to which "[t]hey kind of said okay. That was the gist of it."
Officer Williamson did not call for backup, but the shift sergeant, Jerry Mikielewicz, and juvenile officer, Brad Aleshire, overheard the radio transmission. Within the next few minutes, Officer Aleshire, Sgt. Mikielewicz, and Sgt. Litchfield arrived on the scene. Sgt. Mikielewicz arrived in uniform and a cruiser. Officer Aleshire arrived in street clothes and his personal car. Sgt. Litchfield arrived in street clothes and an unmarked police car. No officer activated a siren or overhead light or displayed a weapon.
Sgt. Litchfield asked Lamberson and Lett if they would be willing to come to the police station. After Lamberson asked why they couldn't talk there, Sgt. Litchfield stated that he did not want to get into a discussion out on the street. After Lamberson and Lett indicated that they would walk to the police station, Sgt. Litchfield offered them a ride. Lamberson rode to the station in the back seat of Sgt. Mikielewicz's cruiser while Lett rode in the back seat of Officer Williamson's cruiser. Before entering the cruisers, Lamberson and Lett were patted down as part a general department policy applicable to anyone riding in a cruiser to insure the safety of police officers.
Officer Williamson further testified that if Lamberson and Lett had refused to go to the police station, there was nothing the police would have done about it. After Lamberson and Lett were asked if they "mind[ed] getting in the back of the cruiser," Williamson stated that "[t]hey got in the back of the cruiser. They were not handcuffed, placed under arrest, or taken into custody."
The two cruisers entered the police garage through an alley. Lamberson and Lett were escorted inside through the back door of the police station. Lamberson was escorted to the blood-alcohol testing room and Lett was escorted elsewhere.
Only Sgt. Litchfield and Officer Aleshire talked to Lamberson in the room, which remained unlocked. Sgt. Litchfield informed Lamberson that he was a suspect in a rape case and asked Lamberson if he would provide a saliva sample for DNA testing. Both Sgt. Litchfield and Officer Aleshire testified that Lamberson hesitated. They believed Lamberson felt that it was an invasive procedure that would hurt him. After Sgt. Litchfield explained that a gauze swab would be inserted between the gum and cheek and then removed, Lamberson said he would do it. After Officer Aleshire left the room to obtain a record check, Lamberson took the "swab gauze," put it into his mouth and then placed it into a plastic bag. Afterwards, Sgt. Litchfield told Lamberson that he was free to leave. The entire encounter with the police took fifteen to twenty minutes.
Sgt. Litchfield further testified that he did not have probable cause for a warrant and used this procedure to circumvent the warrant requirement. He maintained that Lamberson never asked for an attorney, and that he did not record the conversation or use a written consent form because Lamberson and Lett were not in custody or placed under arrest.
The state also presented evidence of circumstances surrounding a subsequent attempt to obtain a second saliva sample from Lamberson. Sgt. Litchfield testified that when he encountered Lamberson on the street again, he asked Lamberson for another saliva sample, but Lamberson refused. Sgt. Litchfield took no further action. However, Officer Michael Watson testified that he obtained a second saliva sample after Lamberson signed a consent form during an arrest for domestic violence on August 17, 1999.
Lamberson testified to a different version of events surrounding the first saliva sample. According to Lamberson, he and Lett stood around and waited for Litchfield. When they asked what it was about, Officer Williamson told them that it concerned stolen bikes and a burglary. In response to Sgt. Litchfield's request to go to the police station, Lamberson testified that he said that "he would walk to the police station," but said "no" when Sgt. Litchfield replied that "we could take you in the cars." When he said "no," Lamberson testified that Sgt. Mikielewicz put his hands on his handcuffs and said, "I think we got enough for an arrest." Under such threat, Lamberson and Lett said they would go. At that time, he was separated from Lett, patted down, and then "just got in the cruiser." He further testified that he was surrounded by police officers on Main Street and felt that he could not walk away from them.
When Sgt. Litchfield asked for a saliva sample, Lamberson testified that he said: "Yeah, I'll do it" because he "had nothing to hide." Then he changed his mind and said: "No, I don't want to do it" and asked to speak to his lawyer. At that time, Lamberson testified that Officer Aleshire said he was going to file charges and then Aleshire left the room. As a result, Lamberson said he changed his mind because he did not want to go to jail.
The trial court found that the consent to obtain the second sample satisfied constitutional scrutiny. The main issue before the trial court was whether the first saliva sample was the result of an unreasonable search and seizure. The trial court denied the motion to suppress this saliva sample, concluding that the officers' conduct in initially approaching Lamberson and Lett on the street was based upon an investigative stop where Sgt. Litchfield had a reasonable and articulable suspicion that Lamberson was involved in the rape, that Lamberson was not constitutionally seized, that Lamberson had simply agreed to go to the police station, and that Lamberson voluntarily consented to give the police a saliva sample.
In rendering its decision, the trial court made several important credibility assessments and findings of fact. The trial court made it clear that it found the testimony of the officers to be credible and the testimony of Lamberson not credible. The trial court resolved factual discrepancies in the testimony in favor of the state.
Our review of a ruling on a motion to suppress presents a mixed question of law and fact. State v. Long (1998), 127 Ohio App.3d 328,332. When considering a motion to suppress, the trial court assumes the role of the trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of the witnesses.State v. Smith (1997), 80 Ohio St.3d 89, 105; State v. Mills (1992),62 Ohio St.3d 357, 366, certiorari denied, 505 U.S. 1227,112 S.Ct. 3048; State v. Anderson (1995), 100 Ohio App.3d 688, 691. An appellate court must defer to the trial court's factual findings if they are supported by competent, credible evidence. State v. Retherford (1994),93 Ohio App.3d 586, 593, appeal dismissed, 69 Ohio St.3d 1488. Accepting the trial court's factual findings, the appellate court determines "without deference to the trial court, whether the court has applied the appropriate legal standard." Anderson at 691.
The Fourth Amendment to the United States Constitution requires a police officer to first obtain a warrant based upon probable cause and approved by a judge or magistrate before conducting a search. Schnecklothv. Bustamonte (1973), 412 U.S. 218, 219, 93 S.Ct. 2041, 2043. Section14, Article I of the Ohio Constitution provides protections that are coextensive with those provided by the Fourth Amendment to the United States Constitution. Ohio v. Robinette (1997), 80 Ohio St.3d 234, 245.
Searches and seizures for evidence conducted outside the judicial process, "are per se unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions." Katz v. United States (1967), 389 U.S. 347, 357,88 S.Ct. 507, 514. It is undisputed by the parties in this case that a search and seizure of evidence conducted pursuant to a valid consent is a specifically recognized exception to the general warrant requirement. SeeSchneckloth, 412 U.S. at 219, 93 S.Ct. at 2043; State ex rel. Holcomb v.Wurst (1989), 63 Ohio App.3d 629, 635.
"The Fourth Amendment test for a valid consent to search is that the consent be voluntary, and `voluntariness is a question of fact to be determined from all the circumstances.'" State v. Robinette (1996),519 U.S. 33, 40, 117 S.Ct. 417, 421, quoting _Schnecklock,412 U.S. at 248-249, 93 S.Ct. at 2059; Holcomb at 635. The state's burden "is not satisfied by showing a mere submission to a claim of lawful authority."Schneckloth, 412 U.S. at 233, 93 S.Ct. at 2051; Robinette,80 Ohio St.3d, at 243.
Further, the state must prove by clear and convincing evidence, that the consent was freely and voluntarily given. State v. Jackson (1996),110 Ohio App.3d 137, 142. See, also, State v. Posey (1988),40 Ohio St.3d 420, 427 (clear and "positive" evidence). Clear and convincing evidence is that evidence "which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." Cincinnati Bar Assn. v. Massengale (1991),58 Ohio St.3d 121, 122, quoting _Cross v. Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus. While clear and convincing evidence is "more than a mere `preponderance of the evidence,'" it does not rise to the level of "evidence `beyond a reasonable doubt.'" Id.
If the state obtained Lamberson's consent "during a period of illegal detention," the consent is negated "even though voluntarily given if [the consent is] the product of the illegal detention and not the result of an independent act of free will." Florida v. Royer (1983), 460 U.S. 491,501, 103 S.Ct. 1319, 1326; Robinette, 80 Ohio St.3d at paragraph three of the syllabus. For consent to be considered an independent act of free will, "the totality of the circumstances must clearly demonstrate that a reasonable person would believe that he or she had the freedom to refuse to answer further questions and could in fact leave." Royer, 460 U.S. 491,501, 103 S.Ct. 1319, 1326; Robinette at paragraph three of the syllabus.
If, however, no illegal detention occurred, the state need not demonstrate the Lamberson's consent was an independent act of free will. Rather, a warrantless search based upon a suspect's consent while not in custody is valid if the "consent was in fact voluntarily given, and not the result of duress or coercion, express or implied" under the totality of the circumstances. Schneckloth, 412 U.S. at 248, 93 S.Ct. at 2059; see, also, State v. Taylor (1991), 77 Ohio App.3d 223, 226. The holding in Schneckloth has been extended to in-custody cases as well. See UnitedStates v. Watson (1976), 423 U.S. 411, 425, 96 S.Ct. 820, 828 (finding that custody is a factor to be considered under the totality of the circumstances test).
In the present case, Lamberson maintains that the state has not met its burden to prove that the search and seizure resulting in the first saliva sample was voluntary under the totality of the circumstances surrounding the entire police encounter. In support of his argument, he points to the following facts: the police approached him on a public street rather than at his home, four police officers in four separate vehicles came to the scene, the police patted him down and separated him from Lett, the police drove him to the police station while he was locked in the back seat of a police cruiser, they entered the police station through a garage and the back doors, and the police placed him into an interrogation room to achieve their objective.
Lamberson further asserts for the first time on appeal that the state must prove his consent was an independent act of free will as set forth in Robinette. It is axiomatic that a party cannot raise new issues or legal theories for the first time on appeal. See e.g., Stores Realty v.Cleveland (1975), 41 Ohio St.2d 41, 43; Chandler and Assoc., Inc. v.America's Healthcare Alliance, Inc. (1997), 125 Ohio App.3d 572, 582.
The trial court found that Lamberson's consent was voluntary, and that it was not relevant whether Lamberson was illegally detained. However, the trial court never made any express finding that Lamberson was illegally detained. Nor did it evaluate the totality of the circumstances under the objective reasonable person standard to indicate that Lamberson's consent was the product of an independent act of his own free will if, in fact, he was illegally detained. See Royer, 460 U.S. 491,501, 103 S.Ct. 1319, 1326; _Robinette, 80 Ohio St.3d at paragraph three of the syllabus. Although we agree with the trial court's conclusion that Lamberson voluntarily consented to give the police the saliva sample, we find that the trial court misapplied the applicable legal standard to its factual findings.
We begin by first considering whether the facts of this case gave rise to an illegal detention, i.e., a seizure in violation of theFourth Amendment, at any time throughout the police encounter. This court has held that "[a]n encounter which does not involve physical force or a show of authority is a consensual encounter that does not triggerFourth Amendment scrutiny; therefore, an officer does not need reasonable suspicion merely to approach an individual in order to make reasonable inquiries of him." State v. Smith (Oct. 16, 1995), Madison App. No. CA95-03-009, unreported, at 3; see, also, State v. Reed (Sept. 11, 2000), Clermont App. No. CA99-11-102, unreported, at 5.
"[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, * * * ask to examine the individual's identification, * * * and request consent to search[,] * * * as long as the police do not convey a message that compliance with their requests is required." Florida v. Bostick,501 U.S. 428, 434-435, 111 S.Ct. 2382, 2386. No Fourth Amendment seizure occurs when a law enforcement officer "merely approach[s] an individual on the street or in another public place, * * * ask[s] him if he is willing to answer some questions, [or] * * * questions * * * him if the person is willing to listen * * *." Royer, 460 U.S. at 497,103 S.Ct. at 1324.
Absent some evidence of physical force or show of authority, an encounter between police officers and a member of the public is not a seizure. United States v. Mendenhall (1980), 446 U.S. 544, 553,100 S.Ct. 1870, 1877. "A person has been `seized' within the meaning of theFourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Id., 446 U.S. at 554, 100 S.Ct. at 1877. Accordingly, the test for a seizure does not depend upon either Lamberson's or the officers' subjective appraisal of the situation, except to the extent the officers' views were communicated to Lamberson at the time. See id.,446 U.S. at 554 n. 6, 100 S.Ct. at 1877 n. 6.
In finding that Lamberson was not constitutionally seized, the trial court relied on the fact that it had found no credibility in Lamberson's statement that he did not believe that he was free to leave. In doing so, the trial court relied on Lamberson's and the officers' subjective views. It did not consider whether a reasonable person in Lamberson's situation would have believed that he was free to leave under the totality of the circumstances. See Mendenhall, 446 U.S. at 554,100 S.Ct. at 1877. The trial court, however, did find that a reasonable person in Lamberson's situation would not have believed that he was in custody.
A review of the record sustains the trial court's findings and shows that a reasonable person placed in the same circumstances would have believed that he was free to leave. Officer Williamson approached Lamberson and Lett on a public street; he did not summon them. Although Officer Williamson was in uniform and a marked cruiser, he did not activate his siren or overhead lights. No weapons were displayed. Nor did Lamberson express any threat from Officer Williamson. As such, the initial encounter was a consensual encounter.
Although three more London police officers converged on the scene within a few minutes, the encounter remained consensual. The number of officers that arrived, the swiftness with which they arrived, and that they each arrived in separate cars would cause a reasonable person to feel intimidated or threatened by this type of police presence. However, this circumstance, by itself, is not enough to cause a reasonable person to feel that he or she is not free to leave.
Here, one of the three police officers was expected. Two officers arrived in street clothes and one in an unmarked car, and one in a personal car. None of the officers activated a siren or overhead lights. No weapons were displayed. Although Lamberson rode to the police station in the back seat of a police cruiser, the restriction on his freedom to leave was very brief and occurred only after Lamberson informed Sgt. Litchfield that he would walk to the police station, which was less than two blocks away. The overall actions of the police officers are not those of officers placing a person under arrest or taking a person into custody. Lamberson was never arrested or handcuffed, and was only patted down as part of the department's policy for the safety of the officer. Officer Williamson testified that if Lamberson and Lett had refused and/or walked away, the police could have done nothing about it. The entire encounter with the police lasted less than twenty minutes. Accordingly, there is competent, credible evidence to support the trial court's finding that Lamberson was not constitutionally seized.
Next, the totality of the circumstances must show that Lamberson voluntarily consented to wait for Sgt. Litchfield and to go to the police station so that his subsequent consent to provide a saliva sample was not preceded by any illegal detention. See Mendenhall, 446 U.S. at 557,100 S.Ct. at 1879, citing Schneckloth, 412 U.S. at 227, 93 S.Ct. at 2047. Although the trial court did not consider the totality of the circumstances surrounding his consent in either of these two situations, the record sustains the trial court's findings that Lamberson voluntarily consented to wait for Sgt. Litchfield and simply agreed to go to the police station.
The record reveals that Lamberson was eighteen years old and had an eleventh grade education. He admitted to his extensive juvenile record, indicating that he was plainly capable of a knowing consent. He was very familiar with arrest, detention and criminal investigations.
The circumstances first show that Lamberson voluntarily consented to wait for Sgt. Litchfield. Officer Williamson simply asked him to wait; it was not an order. At the time, only one officer was present and Lamberson expressed he felt no threat from him. In fact, after being informed that he was a suspect in some recent crimes, Lamberson stood around and waited for Sgt. Litchfield.
The circumstances further show that Lamberson voluntarily consented to go to the police station. Explaining that the street was not a good place to discuss the matter, Sgt. Litchfield simply asked Lamberson and Lett to go to the police station; he did not order them to go. Even Lamberson testified that he told Sgt. Litchfield that he would walk to the police station. The fact that he was driven to the police station did not undermine his previous willingness to walk to the police station. Accordingly, we find that there is competent credible evidence to support the trial court's findings that Lamberson voluntarily consented to wait for Sgt. Litchfield and go to the police station. Therefore, the police lawfully detained Lamberson based upon his voluntary consent.
Finally, because Lamberson voluntarily consented to wait for Sgt. Litchfield and to go to the police station, it cannot be argued that Lamberson's subsequent consent to give a saliva sample was preceded by any unlawful detention. As such, the state was not required to show that Lamberson's consent was the result of an independent act of free will because the totality of the circumstances clearly demonstrates that a reasonable person in Lamberson's situation would believe that he had the freedom to refuse and could in fact leave. See Royer, 460 U.S. at 501,103 S.Ct. at 1326; Robinette, 80 Ohio St.3d at paragraph three of the syllabus. Therefore, the trial court needed only to find that Lamberson's consent to give a saliva sample "was in fact voluntarily given, and not the result of duress or coercion, express or implied," and not "a mere submission to a claim of lawful authority." See Schneckloth,412 U.S. at 233, 248, 93 S.Ct. at 2051, 2059.
The trial court made the required findings despite its failure to find that Lamberson's consent was not the product of an illegal detention. There is competent, credible evidence in the record to sustain the trial court's conclusion that Lamberson's consent was voluntary under the holding in Schneckloth. See id.,412 U.S. at 233, 248, 93 S.Ct. at 2051, 2059.
Lamberson was clearly familiar with police investigations and was capable of a knowing consent. Sgt. Litchfield informed Lamberson that he was a suspect in a rape case prior to the request for a saliva sample for DNA testing. By the language used, it was simply a request, not an order. The room remained unlocked, only two non-uniform officers were present. No weapons were displayed and no physical threats were made. The entire encounter in the room was brief. In fact, Lamberson placed a swab gauze in his mouth and then into a plastic bag. Officer Aleshire corroborated Sgt. Litchfield's testimony that Lamberson never requested an attorney during the time that he was in the room.
Lamberson argues that Sgt. Litchfield employed this procedure to approach him in a public place rather than at his residence to coerce him into giving the police a saliva sample. However, the record supports the trial court's finding that Lamberson was not constitutionally seized and simply agreed to go to the police station; Lamberson's presence at the police station was therefore voluntary. The fact that Lamberson was approached in public and brought to an interrogation room at the police station is little or no evidence that he was in any way coerced or threatened. Nor are the facts that the officers did not record the conversation or have Lamberson sign a consent form.
Lamberson further argues that he expressed reluctance to provide a saliva sample and asked for an attorney. This argument is consistent with Lamberson's trial testimony. However, these issues were resolved in favor of the state. The trial court has the discretion to make credibility determinations and may refuse to believe the testimony of one witness while believing that of another witness. Mills,62 Ohio St.3d at 366.
We cannot say that the trial court erred in denying Lamberson's motion to suppress evidence. The first assignment of error is overruled.
Assignment of Error No. 2:
 THE TRIAL COURT ERRED IN ADMITTING THE RAPE KIT, MOUTH SWABS AND THE TESTIMONY CONCERNING THE ANALYSIS THEREOF OVER OBJECTIONS OF APPELLANT.
In his second assignment of error, Lamberson maintains that the state failed to sufficiently authenticate and identify the rape kit and the saliva samples, and that these items, the DNA test results and supporting testimony were therefore inadmissible at trial. Specifically, Lamberson argues that the state presented nine witnesses who had personal knowledge of one or both of these items, but no one ever positively identified the rape kit as the one collected from E.H. or the saliva sample as the one collected from him. Lamberson further argues that the witnesses identified several evidence submission sheets but never testified that the rape kit and the saliva samples remained in the same condition as when they were collected. According to Lamberson, he was prejudiced by the erroneous admission of all the DNA evidence, the only evidence linking him to the crimes, because he presented substantial exculpatory evidence.
The trial court has broad discretion in the admission and exclusion of evidence and, absent a clear abuse of discretion, a reviewing court will not disturb the trial court's decision. State v. Sargent (1998),126 Ohio App.3d 557, 564-565, citing State v. Combs (1991),62 Ohio St.3d 278, 284. The phrase "abuse of discretion" connotes more than an error of law or judgment; it implies that the trial court's action was unreasonable, arbitrary or unconscionable. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219.
Evid.R. 901(A) states that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Such evidence may be supplied by the testimony of a witness with knowledge. Evid.R. 901(B)(1).
It is not necessary that every person who handles demonstrative evidence from a suspect positively identify the evidence at trial. SeeState v. Ford, 1998 Ohio App. WL 725990, at *3 (Sept. 21, 1998), unreported; Cleveland v. Harmon, 1993 Ohio App. WL 489752, at *5 (Nov. 24, 1993), Cuyahoga App. No. 64139, unreported. However, the better practice is to have such evidence. Ford, 1998 Ohio App. WL 725990 at *3.
In such cases where the physical evidence may be used up in part or in total for testing purposes, the state need only show that the specimen remained in an unchanged condition from the time it was collected until it was analyzed. This may be done by showing that the container and its label and seal were in the same condition at both times. See, e.g.,Harmon, 1993 Ohio App. WL 489752 at *5 (evidence showing that the seal remained unbroken prior to testing).
A "chain of custody" is part of the authentication and identification requirement set forth in Evid.R. 901. State v. Brown (1995),107 Ohio App.3d 194, 200; State v. Barzacchini (1994), 96 Ohio App.3d 440,458. "The state need only establish that it is reasonably certain that substitution, alteration or tampering did not occur." Brown at 200, quoting State v. Blevins (1987), 36 Ohio App.3d 147, 150. In fact, a strict chain of custody is not always required in order for physical evidence to be admitted. State v. Wilkins (1980), 64 Ohio St.2d 382,389. A chain of custody may be established by direct testimony or inference. State v. Conley (1971), 32 Ohio App.2d 54, 62. Moreover, any breaks in the chain of custody go to the weight of the evidence, not its admissibility. Brown, 107 Ohio App.3d at 200.
In the present matter, the record reveals that each person who handled the rape kit and/or the saliva samples testified at trial. Nurse Brown prepared and sealed the rape kit. She turned it over to Officer Albright along with two bags of clothing, a vaginal speculum, and bed sheet section. Officer Albright turned over the rape kit along with the other items to Officer Kenneth Reffitt that same day, along with an evidence submission sheet. Officer Reffitt locked the rape kit and the other items, which were sealed, in the London Police Department's evidence room locker to which only he had keys.
Sgt. Litchfield obtained the saliva sample from Lamberson on July 29, 1999. The saliva sample was placed into a plastic bag and sealed with evidence tape. A saliva sample was then collected from Lett and sealed in a plastic bag with evidence tape. Sgt. Litchfield locked the saliva samples in his office, to which only he had keys, until Officer Reffitt returned from vacation. On August 3, 1999, Sgt. Litchfield turned over the saliva samples to Officer Reffitt with an evidence submission form listing a saliva sample from Lett and a saliva sample from Lamberson. Officer Reffitt testified that the saliva samples were sealed when he received them. Upon receipt of the saliva samples, Officer Reffitt transported those samples and the rape kit to BCII. Further, Officer Reffitt identified the rape kit and saliva samples on direct and cross-examination as those items that he had received and transported to BCII.
Lisa Crain, a BCII office assistant, and Saupe received the rape kit and saliva samples along with the other items (two bags of clothing, vaginal speculum, section of bed sheet) from Officer Reffitt on August 3, 1999. Crain inventoried and gave the items identification numbers. Saupe picked up the rape kit and saliva samples, which were sealed, from Reffitt and prepared samples for testing for the presence of semen and for DNA analysis. The samples for DNA analysis were put into labeled coin envelopes, sealed, and placed in a freezer. Saupe repackaged the unused portions of the rape kit and saliva samples and placed them in BCII's property evidence room. On October 28, 1999, Officer Reffitt picked up the rape kit and the saliva samples and the other items and placed them in the evidence locker where they remained until court proceedings commenced in this case.
Duvall testified that she performed DNA analysis on the specimens in coin envelopes, and that remainder of the specimens in the coin envelopes used for DNA testing remained at BCII. The record contains no evidence that these items were removed from BCII, or that they were tampered with or contaminated.
Taken as a whole, this evidence shows that the rape kit and saliva samples in question were what the prosecutor claimed them to be, i.e., the rape kit collected from E.H. and the saliva samples collected from Lamberson and Lett. See Ford, 1998 Ohio App. WL 725990 at *3. The state's failure to have witnesses other than Officer Reffitt positively identify this evidence goes to the weight of the evidence, not its admissibility. See Brown, 107 Ohio App.3d at 200.
For these reasons, the trial court did not abuse its discretion by admitting the rape kit and the saliva samples or the DNA test results and testimony therefrom. Lamberson's second assignment of error is overruled.
Assignment of Error No. 3:
 THE TRIAL COURT ERRED IN DECLARING APPELLANT, MICHAEL LAMBERSON, A SEXUAL PREDATOR, AS DEFINED IN CHAPTER 2950.
In his third assignment of error, Lamberson contends the state failed to prove by clear and convincing evidence that he is a sexual predator.
A sexual predator is defined as "a person who has been convicted of or pleaded guilty to committing a sexually oriented offense and is likely to engage in the future in one or more sexually oriented offenses." R.C.2950.01(E). To determine whether an offender is a sexual predator, the trial court holds an adjudication hearing where the parties are given an opportunity to testify, present evidence, and call and cross-examine witnesses and expert witnesses. R.C. 2950.09(B)(1).
The Ohio Rules of Evidence do not strictly apply to sexual predator adjudication hearings. State v. Cook (1998), 83 Ohio St.3d 404,423-424, certiorari denied, (1999), 525 U.S. 1182, 119 S.Ct. 1122. The trial judge may consider reliable hearsay such as a presentence investigation report. Id. The trial court may also consider expert testimony and a forensic report prepared by a psychologist. See Statev. Southerland (Dec. 30, 1999), Butler App. No. CA99-01-013, unreported. After considering all the evidence and testimony, a determination that an offender is a sexual predator must be supported by clear and convincing evidence. R.C. 2950.09(B)(3).
Our review of the trial court's determination that Lamberson is a sexual predator focuses on whether evidence was presented relating to the factors enumerated in R.C. 2950.09(B)(2). Pursuant to R.C. 2950.09(B)(2), the trial court shall consider all relevant factors, including, but not limited to, all of the following:
(a) The offender's age;
 (b) The offender's prior criminal record regarding all offenses, including, but not limited to, all sexual offenses;
 (c) The age of the victim of the sexually oriented offense for which sentence is to be imposed;
 (d) Whether the sexually oriented offense for which sentence is to be imposed involved multiple victims;
 (e) Whether the offender used drugs or alcohol to impair the victim of the sexually oriented offenses or to prevent the victim from resisting;
 (f) If the offender previously has been convicted of or pleaded guilty to any criminal offense, whether the offender completed any sentence imposed for the prior offense, and, if the prior offense was a sex offense or a sexually oriented offense, whether the offender participated in available programs for sexual offenders;
 (g) Any mental illness or mental disability of the offender;
 (h) The nature of the offender's sexual conduct, sexual contact, or interaction in a sexual context with the victim of the sexually oriented offense and whether the sexual conduct, sexual contact, or interaction in a sexual context was part of a demonstrated pattern of abuse;
 (i) Whether the offender, during the commission of the sexually oriented offense for which sentence is to be imposed, displayed cruelty or made one or more threats of cruelty;
 (j) Any additional behavioral characteristics that contribute to the offender's conduct.
Further, it is important to note that the trial court may look into a defendant's past behavior. State v. Naegele (Jan. 12, 1998), Clermont App. No. CA97-04-043, unreported, at 5, affirmed, 84 Ohio St.3d 19. The trial court is not required to find that the evidence presented supports a majority of the factors listed in R.C. 2950.09(B)(2). State v. Fugate
(Feb. 2, 1998), Butler App. No. CA97-03-065, unreported, at 7. In fact, the trial court may rely upon one factor more than another, depending upon the circumstances of the case. State v. Wilson (Nov. 13, 2000), Fayette App. No. CA99-09-024, unreported, at 12, citing State v. Bradley
(June 19, 1998), Montgomery App. Nos. 16662 and 16664, unreported. Moreover, a single conviction for a sexually oriented offense may support a finding that a defendant is a sexual predator. See State v. Higgins
(May 22, 2000), Clermont App. No. CA99-07-068, unreported; State v.Nicholas (Apr. 6, 1998), Warren App. Nos. CA97-05-045, et al., unreported.
In the instant case, the state presented a report and testimony from Dr. Chris Khellaf, a clinical and forensic psychologist at NetCare Forensic Center, the presentence investigative report, and Lamberson's conviction for rape. This evidence establishes a majority of the relevant R.C. 2950.09(B)(2) factors.
At the time of the offense, Lamberson was eighteen years old, and the victim was an elderly seventy-five-year-old woman. R.C. 2950.09(B)(2)(a) and (c). Lamberson has numerous arrests and he had been found delinquent for unauthorized use of a motor vehicle, unruly for curfew violations, aggravated trespass, robbery and three assaults. He often committed another offense before completing a sentence for a prior offense and had seven probation violations. Based upon his prior criminal conduct, Dr. Khellaf testified that there is a substantial probability that Lamberson would engage in assaultive behavior in the future, and that it was likely to incorporate a similar type of sexual assault.
The presentence investigation report reveals that Lamberson had not accepted any responsibility for the rape offense. R.C. 2950(B)(2)(b) and (j). Lamberson was found guilty of rape, a sexually oriented offense under R.C. 2950.01(D), that was part of a pattern of abuse demonstrated by a history of three recent assaults and aggressive behavior. R.C.2950.09(B)(2)(h). The rape offense, itself, was inherently cruel as noted by the trial court and involved others acts of cruelty. During the commission of the rape, Lamberson held a knife against the victim's throat and slapped her face. R.C. 2950.09(B)(2)(i).
Based upon the foregoing, we conclude that there is clear and convincing evidence to support the trial court's determination that Lamberson is a sexual predator. Accordingly, Lamberson's third assignment of error is overruled.
Assignment of Error No. 4:
 THE STATE FAILED TO PROVE BY PROOF BEYOND A REASONABLE DOUBT THE ELEMENTS OF AGGRAVATED BURGLARY.
In his fourth assignment of error, Lamberson contends that the state failed to prove beyond a reasonable doubt an element of aggravated burglary: trespass by force, stealth or deception. According to Lamberson, the state presented no evidence to prove that he gained entry by force, stealth or deception.
"An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. After viewing the evidence in a light most favorable to the prosecution, the relevant inquiry is whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Id.
In the present case, the state presented its case on the theory of trespass by stealth. The use of stealth to enter an occupied structure has been characterized as "any secret, sly or clandestine act to avoid discovery and to gain entrance into or remain with a residence of another without permission." State v. Lane (1976), 50 Ohio App.2d 41, 47. Construed in the state's favor, the evidence showed that Lamberson hid E.H.'s dog to avoid discovery and to gain entry into her apartment at night through a door without permission.
After viewing this evidence in a light most favorable to the state, we find that any rational trier of fact could have found beyond a reasonable doubt the element of trespass by stealth. Accordingly, the fourth assignment of error is overruled.
Assignment of Error No. 5:
 THE TRIAL COURT ERRED IN ALLOWING THE JURY TO FIND APPELLANT GUILTY OF BOTH AGGRAVATED BURGLARY AND RAPE AND FURTHER ERRED IN SENTENCING APPELLANT TO CONSEQUETIVE [sic] TERMS UPON CONVICTION OF BOTH OFFENSES.
In his final assignment of error, Lamberson presents two issues for our review. In his first issue for review, Lamberson contends that he cannot be convicted for both aggravated burglary and rape because these crimes are allied offenses of similar import for purposes of R.C. 2941.25, Ohio's multiple-count statute. Lamberson argues that the offenses were part of a continuous act with one animus.
R.C. 2941.25 provides:
 (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
 (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.
In State v. Baker (2000), 137 Ohio App.3d 628, this court discussed and followed the application of R.C. 2941.25 as explained by the Ohio Supreme Court in State v. Rance (1999), 85 Ohio St.3d 632. Id. at 655-656. In determining whether crimes are allied offenses of similar import under R.C. 2941.25(A), "[c]ourts should assess, by aligning the elements of each crime in the abstract, whether the statutory elements of the crimes `correspond to such a degree that the commission of one crime will result in the commission of the other.'" Rance at 638, citing State v. Jones
(1997), 78 Ohio St.3d 12, 14. "[I]f the elements do so correspond, the defendant may not be convicted of both unless the court finds that the defendant committed the crimes separately or with separate animus." Id.
at 638-639. Here, Lamberson was convicted of aggravated burglary in violation of R.C. 2911.11(A)(1) and rape in violation of R.C.2907.02(A)(2). R.C. 2911.11(A) provides that:
 [n]o person, by force, stealth, or deception, shall trespass in an occupied structure * * *, when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if any of the following apply: (1) The offender inflicts, or attempts or threatens to inflict physical harm on another; * * *.
R.C. 2907.02(A)(2) provides that:
 [n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force.
A comparison of the statutory elements of the two offenses reveals that aggravated robbery and rape are not allied offenses of similar import. Aggravated burglary requires trespass in an occupied structure by force, stealth, or deception where the offender inflicts or attempts to inflict physical harm. By contrast, rape requires sexual conduct brought about by force or the threat of force. Because each offense requires proof of an element that the other does not, they are not allied offenses of similar import. See State v. Moss (Dec. 28, 1999), Franklin App. No. 99AP-3, unreported (finding that aggravated burglary and attempted rape are not allied offenses of similar import).
Furthermore, the trial court found that Lamberson had a separate animus for committing aggravated burglary by hiding E.H.'s dog to gain entry. See R.C. 2941.25(B). Accordingly, Lamberson's convictions for aggravated burglary and rape did not violate R.C. 2941.25.
In his second issue for review, Lamberson contends that even if he can be convicted for both offenses, the trial court erred by imposing consecutive sentences. Specifically, Lamberson argues that none of the three factors pursuant to R.C. 2929.14(E)(4)(a)- (c) are applicable in his case.
Pursuant to R.C. 2953.08(G)(1), an appellate court may not disturb a sentence imposed under felony sentencing law unless it finds by clear and convincing evidence that the sentence is not supported by the record or is contrary to law. State v. Garcia (1998), 126 Ohio App.3d 485, 487. To impose consecutive sentences, a trial court must make certain findings and give its reasons for selecting consecutive sentences. R.C.2929.19(B)(2)(c); R.C. 2929.14(E)(4); see State v. Edmonson (1999),86 Ohio St.3d 324, 326.
First, the trial court must find that consecutive sentences are necessary to protect the public from future crime or to punish the offender. R.C. 2929.14(E)(4). Second, the consecutive terms must not be disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. Id. Third, the trial court must find that one of the following factors listed in R.C. 2929.14(E)(4)(a) through (c) applies:
 (a) The offender committed the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
 (b) The harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct.
 (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.
In the instant case, the trial court found that Lamberson's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crimes and that a single sentence would not reflect the seriousness of his conduct or adequately protect the public from future crimes. These findings satisfy the requirements of R.C.2929.14(E)(4) and the additional factor requirement under R.C.2929.14(E)(4)(c).
Lamberson, however, argues without authority that the record does not support a finding under R.C. 2929.14(E)(4)(c). According to Lamberson, the trial court was precluded from finding R.C. 2929.14(E)(4)(c) applicable because of his age and the fact that he has never committed any other crimes as an adult. We disagree.
We note that the sentencing statutes do not preclude the imposition of consecutive sentences for crimes committed by an eighteen-year-old. Further, a trial court can rely on a juvenile record for the imposition of consecutive sentences to support a finding under R.C. 2929.14(E)(4)(c). See State v. King (Aug. 9, 2000), Auglaize App. No. 2-2000-13, unreported; State v. Toole (Dec. 20, 1999), Mahoning App. No. 98 C.A. 131, unreported; State v. Rose (Sept. 15, 1997), Clermont App. No. CA96-11-106, unreported, at 17-18.
We therefore find that Lamberson's sentences were clearly and convincingly supported by the record and not contrary to law. Accordingly, the trial court did not err by convicting Lamberson for aggravated burglary and rape or by imposing consecutive sentences. The fifth assignment of error is overruled.
Judgment affirmed.
 _______________ YOUNG, P.J.
WALSH and VALEN, JJ., concur.