[Cite as *State v. Weimer*, 2013-Ohio-5651.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2013-L-008** |
| ZACHARY R. WEIMER, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Lake County Court of Common Pleas, Case No. 12 CR 000425.

Judgment: Affirmed.

*Charles E. Coulson,* Lake County Prosecutor and *Karen A. Sheppert,* Assistant Prosecutor, Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Joseph R. Klammer,* The Klammer Law Office, LTD., Lindsay II Professional Center, 6990 Lindsay Drive, #7, Mentor, OH 44060 (For Defendant-Appellant).

DIANE V. GRENDELL, J.

{¶1} Defendant-appellant, Zachary R. Weimer, appeals his convictions, following a jury trial in the Lake County Court of Common Pleas, for Aggravated Murder, Murder, Aggravated Robbery, Aggravated Burglary, Felonious Assault, Tampering with Evidence, Grand Theft of a Motor Vehicle, Theft from an Elderly Person, and Receiving Stolen Property. The issues to be determined by this court are whether convictions for murder charges are supported by the weight of the evidence when there is testimony

that the defendant had stolen property from the victim's home and that he admitted committing the murder to other inmates in jail; whether trial counsel was ineffective by failing to file a motion to suppress based on the temporary detention of the defendant to investigate potential stolen property and drug paraphernalia; and whether the statement of a co-conspirator is admissible as a hearsay exception. For the following reasons, we affirm the judgment of the court below.

{¶2} On August 14, 2012, the Lake County Grand Jury issued an Indictment, charging Zachary with the following: two counts of Aggravated Murder (Counts One and Two), unclassified felonies, in violation of R.C. 2903.01(B); two counts of Murder (Counts Three and Four), unclassified felonies, in violation of R.C. 2903.02(A) and (B); two counts of Aggravated Robbery (Counts Five and Six), felonies of the first degree, in violation of R.C. 2911.01(A)(1) and (3); two counts of Aggravated Burglary (Counts Seven and Eight), felonies of the first degree, in violation of R.C. 2911.11 (A)(1) and (2); Felonious Assault (Count Nine), a felony of the second degree, in violation of R.C. 2903.11(A)(1); two counts of Tampering with Evidence (Counts Ten and Eleven), felonies of the third degree, in violation of R.C. 2921.12(A)(1); Grand Theft of a Motor Vehicle (Count Twelve), a felony of the fourth degree, in violation of R.C. 2913.02(A)(1); Theft from an Elderly Person (Count Thirteen), a felony of the fourth degree, in violation of R.C. 2913.02(A)(1) and (B)(3); three counts of Receiving Stolen Property (Counts Fourteen-Sixteen), felonies of the first and fourth degree and a misdemeanor of the first degree, in violation of R.C. 2913.51(A); and one count of Engaging in a Pattern of Corrupt Activity (Count Seventeen), a felony of the first degree, in violation of R.C. 2923.32(A)(1).

2

{¶3} On November 9, 2012, Zachary's counsel filed two Motions in Limine. One included a request that the State refrain from referencing the co-conspirator, Danna Weimer's, statements, which included handwritten letters Danna sent to Zachary while he was incarcerated. Argument was presented regarding this issue at several times during the course of the trial, but the Motion was ultimately denied.

{¶4} A jury trial was held in this matter between November 8-19, 2012. Prior to the start of the trial, the State moved to dismiss Count Fifteen, Receiving Stolen Property, a misdemeanor of the first degree, and Count Seventeen, Engaging in a Pattern of Corrupt Activity. These two charges were dismissed and Count Sixteen was renumbered as Count Fifteen.

{¶5} At trial, the following pertinent testimony and evidence were presented.

{¶6} On June 13, 2012, several individuals living on or near Canterbury Drive in Madison, Ohio, neighbors of seventy-seven year old Eleanor Robertson, noticed that Eleanor's van was gone but her garage door was open, which was not normal behavior for Eleanor. Jerry Deel testified that his wife had spoken to Eleanor at approximately 2:30 p.m. on June 12, but on June 13, at about 8 a.m. he noticed the open garage door. Throughout the day, the neighbors attempted to contact Eleanor, who lives alone in her home, but were unable to do so. That evening, they called Eleanor's son, Scot Robertson, and were able to gain access to her home to investigate. They noticed that the home was "ransacked," items were strewn about Eleanor's bedroom and other rooms, and there were various lit candles sitting around the home. They also noted that the front door was "barricaded" with chairs.

{¶7} Upon entering the home, Scot saw a liquid squirted on the walls and floor in his mother's bedroom. He testified that the home was "trashed." In his mother's room, the mattress had been slid over and there was a large pile of clothes on the floor.

{¶8} Meanwhile, at approximately 5:30 p.m. on June 13, Patrolman Don Ivory, of the Euclid Police Department, was patrolling the area near the Gold Werks store in Euclid, where individuals sell gold and other items. He testified that this area is known for drug activity and that individuals often sell stolen property at the Gold Werks store. Patrolman Ivory observed a woman, later identified as Danna Weimer, sitting in a vehicle in the parking lot near the store, leaning from the driver's seat into the passenger seat. He thought that she may need assistance, and approached the car. He noticed that she was leaning over to examine jewelry spread out on the passenger seat, testing it with a magnet to determine if it was real. Patrolman Ivory also saw a large box of the jewelry and that the back seat was stacked full of items. He asked who the jewelry belonged to and she stated that it was her son's. Patrolman Ivory asked for her driver's license, which she retrieved from her purse. At that time, he saw a syringe in her purse, indicating possible drug use.

{¶9} Patrolman Ivory then called for backup and two officers responded. Subsequently, Zachary, Danna's son, exited the Gold Werks store and Patrolman Ivory requested identification, which he did not produce. Patrolman Ivory asked for his name and date of birth, but Zachary stated that he was "Gregory Weimer." While Patrolman Ivory was investigating his identity, Zachary put his hands in his pockets, was asked to remove them, but continued placing them in his pockets. Zachary was handcuffed for this reason. Patrolman Ivory also noted that, generally, to complete a transaction at

4

Gold Werks, identification is required, so his failure to provide one to police was suspicious.

{¶10} Patrolman Ivory explained that Danna gave him permission to search the car, in which he found various items of property, including the jewelry, a knife, and a pellet gun. Danna and Zachary were subsequently arrested and Patrolman Ivory performed an inventory search of the car and took photographs of the items inside.

{¶11} Patrolman Ivory was later informed of a missing person alert for an individual named Eleanor Robertson. He recognized this name from a lock box recovered from the car and sent the photographs of the items to the Madison Police.

{¶12} On that date, Scot was able to view the photographs that Patrolman Ivory had sent to Madison Police, while he was still at Eleanor's home. He identified most of the recovered property as belonging to Eleanor, including baseball memorabilia, a knife, jewelry, a lockbox, and various other items. Penny Borton, Eleanor's daughter, was also able to identify these items as belonging to her mother. She later identified these items in person at the Madison Police Department.

{¶13} Several employees of the Lake County Crime Lab testified regarding the processing of the crime scene at Eleanor's home on the evening of June 13. While conducting their examination of the home, forensics examiner Jamie Walsh discovered Eleanor's body under a pile of clothes in her bedroom, with a candle "tucked in her arm." Upon completing the processing of the scene that evening, they dusted for fingerprints, but were unable to recover any.

{¶14} Dr. Erica Armstrong, a medical examiner, performed Eleanor's autopsy. Dr. Armstrong testified that Eleanor had been stabbed 94 times, had charring on her back, and there were defensive wounds on her arms and forearm. She noted that the

stab wounds could have been caused by a screwdriver, but she could not identify this as the weapon used. Dr. Armstrong explained that Eleanor died approximately one or two days prior to the autopsy conducted on the morning of June 14.

{¶15} After discovering that Eleanor was deceased and finding the items in Zachary and Danna's possession, they were questioned by police as suspects in the crime but made no admissions.

{¶16} Several witnesses testified regarding the location and activities of Zachary and Danna on June 12 and 13.

{¶17} On the morning of June 12, Nestor Angula saw Danna and Zachary together and Zachary wanted to purchase heroin, which Angula did not have. He observed that Zachary seemed "sick" because he needed heroin.

{¶18} Gregory Weimer, Zachary's brother, testified that he lived on Canterbury Drive near the victim's home and that he purchased the house from Joe Skillthorpe, his mother's boyfriend. In June, including the date of Eleanor's murder, Zachary was staying in his home.

{¶19} Erin Perkins, who was living with Gregory during the time the murder occurred, noted that on the morning of June 12, Zachary and Danna were at Gregory's home, but they were not there at 2 p.m., when she returned.

{¶20} A video from a surveillance system located at Joe Skillthorpe's home, where Danna lived, was played for the jury and described by Lieutenant Timothy Brown. He explained that Zachary and Danna left Skillthorpe's home in Danna's car at approximately 11:15 a.m. on June 12. Danna arrived back at the home at 9:46 p.m., and moved various items in and out of her car. At 4:44 a.m. Zachary arrived at the home, driving what was identified as Eleanor's minivan. He was then seen moving

6

various items from the van to Danna's car. The two carried items between the car and home and also placed some items in a burn pile in the back yard. The van was later driven away by Zachary and located in Ashtabula County on October 14, in a wooded area.

{¶21} Kenneth Larrick, an engineer with AT&T, testified regarding Zachary's cell phone use. Using the location of the cell phone towers, Larrick was able to explain that the phone calls or messages transmitted by the phone occurred closest to the Madison tower, the city where Eleanor's home was located, from 3:41 p.m. on June 12 until 4:19 a.m. on June 13th. He explained that the towers cannot provide an exact location of where cell phone calls originate from but that they transmit calls within a several mile radius.

{¶22} Detective Timothy Doyle recovered various items from Danna's car, which included a screwdriver in the passenger side. This was tested and nothing of evidentiary value was found.

{¶23} David Green, a criminalist with the Lake County Crime Lab, testified regarding shoe prints found on bedding in Eleanor's bedroom. Using a chemical spray on a dusty area of the bed covering, he developed four partial footwear impressions, which appeared to be from the same type of shoe. Green noted that the size, tread pattern, and wear pattern on the shoes worn by Zachary on the date he was arrested matched the prints found on the bedding. He explained, however, that there were no accidental characteristics, such as cuts or imperfections in the shoes, that he could use to state that there was a positive match or identification. Based on all of the other characteristics, however, he also could not exclude the shoes as a match to the prints found at the scene.

7

{¶24} Patrick Sullivan, who was in the Lake County Jail for a probation violation from a prior heroin trafficking charge, testified regarding conversations he had with Zachary while they were both incarcerated. After a preliminary hearing, Zachary returned to the jail and noted that during the hearing, someone stated the victim had been stabbed 90 times. Zachary told Sullivan "that he didn't believe that he stabbed her 90 times. He believed it was closer to nine than 90." Zachary also stated that no one would ever find the murder weapon or the victim's van, since Ashtabula was a large county. Sullivan stated that he thought the weapon may have been a screwdriver, to which Zachary nodded.

{¶25} Sullivan testified that he did have access to newspaper articles which discussed the case, while in jail. He also explained that in exchange for the information regarding Zachary's statements, the prosecutor recommended probation as his sentence.

{¶26} Richard Gould, also incarcerated at the Lake County Jail, spoke to Zachary regarding the murder. Zachary told him that he went to the victim's house "with a buddy" to rob her, and knew her because his mother used to live next door. The victim stated she was going to call 911, and Zachary stabbed her "until his arms got tired," using a screwdriver as the weapon. Zachary told Gould that he put the victim next to the bed, squirted perfume and nail polish remover on her, lit candles to "incinerate her," and barricaded the house.

{¶27} Gould explained that, upon providing the information about Zachary's statements, he was given credit for time served and probation for burglary charges.

{¶28} Lieutenant James Turek, who works at the Lake County Jail, explained that he found letters from Danna in Zachary's cell, as well as a letter from Zachary to

8

Danna. These letters were introduced into evidence. The letters included advice from Danna that Zachary should take a plea bargain because his story would not stand up in court, a statement that she was being "silent," and went over her version of the facts of the events that occurred on June 12 and 13.

{¶29} On November 20, 2012, the jury found Weimer guilty of all 15 counts. This verdict was memorialized in the trial court's November 20, 2012 Judgment Entry.

{¶30} A sentencing hearing was held on December 17, 2012, and a Judgment Entry of Sentence was filed on December 21, 2012. The court merged Counts One, Three, Four, Seven, Eight, and Nine with Count Two; Counts Five, Thirteen, and Fourteen with Count Six, and Count Twelve with renumbered Count Fifteen. The court sentenced Weimer to a term of life imprisonment without parole on Count Two, 11 years in prison on Count Six, 36 months in prison on Count Ten, 36 months on Count Eleven, and 18 months on renumbered Count Fifteen, with the sentences on Counts Six, Ten, Eleven, and Fifteen to run consecutively and prior to the life imprisonment sentence. Weimer was also ordered to pay restitution in the amount of $7,569.05.

{¶31} Zachary timely appeals and raises the following assignments of error:

{¶32} "[1.] The defendant received ineffective assistance of counsel.

{¶33} "[2.] The trial court committed reversible error in admitting the letters between Zachary and Danna Weimer.

{¶34} "[3.] Defendant's conviction is against the manifest weight of the evidence."

{¶35} In his first assignment of error, Zachary argues that trial counsel was ineffective by failing to file a motion to suppress any evidence that was recovered as a result of him being stopped and questioned in the parking lot of the Gold Werks store.

9

He argues that Patrolman Ivory conducted an improper investigatory detention when Zachary was required to provide his identification to police and was prevented from leaving the parking lot.

**{¶36}** The State argues that the police had reasonable suspicion to temporarily detain Zachary for further investigation, based on Danna's behavior and her possession of drug paraphernalia in the vehicle.

**{¶37}** The Ohio Supreme Court has adopted a two-part test to decide whether an attorney's performance is below the constitutional standard for effective assistance of counsel. To reverse a conviction due to ineffective assistance of counsel, the defendant must prove "(1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome of the proceeding." *State v. Madrigal*, 87 Ohio St.3d 378, 388-389, 721 N.E.2d 52 (2000), citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**{¶38}** "When claiming ineffective assistance due to failure to file or pursue a motion to suppress, an appellant must point to evidence in the record showing there was a reasonable probability the result of trial would have differed if the motion had been filed or pursued." (Citation omitted.) *State v. Walker*, 11th Dist. Lake No. 2009-L-155, 2010-Ohio-4695, ¶ 15. "If case law indicates the motion would not have been granted, then counsel cannot be considered ineffective for failing to prosecute it." (Citations omitted.) *Id.*; *State v. Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, 873 N.E.2d 858, ¶ 65 ("[t]o establish ineffective assistance of counsel for failure to file a motion to suppress, a defendant must prove that there was a basis to suppress the evidence in question").

10

**{¶39}** Under the Fourth Amendment, warrantless searches and seizures are unreasonable unless the search falls within an exception to this requirement. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). "There are three general categories in which encounters between citizens and police officers are classified. The first is a consensual encounter; the second is a brief investigatory stop pursuant to *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889; and the third is formal arrest. *State v. Long* (1998), 127 Ohio App.3d 328, 333, 713 N.E.2d 1." *State v. Trevarthen*, 11th Dist. Lake No. 2010-L-046, 2011-Ohio-1013, ¶ 12.

**{¶40}** "It is well-settled that '[a]n encounter may be consensual when a police officer approaches and questions individuals in or near a parked car.'" (Citations omitted.) *State v. Ball*, 11th Dist. Trumbull No. 2009-T-0013, 2010-Ohio-714, ¶ 12. "A consensual encounter is not a seizure, therefore no Fourth Amendment rights are invoked." *Id.* at ¶ 14.

**{¶41}** In the present case, following Patrolman Ivory's interaction with Danna, asking her about the items in the vehicle, Zachary exited the store and Patrolman Ivory asked him to provide identification. Merely asking for identification would not be outside of the scope of a consensual encounter. *State v. Kock*, 11th Dist. Lake No. 2008-L-067, 2008-Ohio-5859, ¶ 17 ("[p]olice may approach an individual, engage in conversation, and request identification, all under the purview of a consensual encounter").

**{¶42}** Further, although Zachary argues that the presence of multiple police cars caused Zachary and Danna's "path to exit in the car they arrived in [to be] blocked," Patrolman Ivory's testimony does not indicate that the cars were blocking the Weimers' vehicle. However, it has been held that when circumstances are present, such as "the threatening presence of several officers * * * or the use of language or tone of voice

11

indicating that compliance with the officer's request might be compelled," a consensual encounter may become a seizure or investigative detention. *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Here, both Patrolman Ivory and two additional officers in separate police cruisers were present, which may have led Zachary to believe he was not free to leave or decline the requests for his identification. *State v. Williams*, 11th Dist. Lake No. 2008-L-182, 2009-Ohio-4098, ¶ 23, citing *Mendenhall* at 554 (Fourth Amendment protections are implicated when "the police officer has by * * * show of authority restrained the person's liberty so that a reasonable person would not feel free to decline the officer's requests"). We also note that the State concedes that the "encounter * * * was an investigative detention."

**{¶43}** Even when evaluating the temporary stop of Zachary to investigate further under the purview of an investigative detention, however, we still cannot find that he would have prevailed on a motion to suppress.

**{¶44}** A police officer may detain a party for investigative purposes so long as he or she has a reasonable, articulable suspicion of criminal activity. *Terry*, 392 U.S. at 21, 88 S.Ct. 1868, 20 L.Ed.2d 889. "The investigatory detention, however, must be limited in duration and scope and can last only as long as is necessary for an officer to confirm or dispel his or her suspicion of criminal activity." (Citation omitted.) *State v. Beaver*, 11th Dist. Trumbull No. 2011-T-0037, 2012-Ohio-871, ¶ 31. It is well-settled that reasonable suspicion requires a minimal level of objective justification, i.e., "something more than an inchoate and unparticularized suspicion or 'hunch.'" (Citations omitted.) *Id.*

**{¶45}** Patrolman Ivory had suspicion of criminal activity, based on the large quantity of items throughout the entire car, including the jewelry that Danna was testing

to determine if it was real, which was suspicious in light of the likelihood of stolen items being sold at Gold Werks. He also observed an unwrapped syringe in Danna's purse, which was possible drug paraphernalia, especially since the area was well-known for drug activity. "An area's reputation for criminal activity is an articulable fact which is a part of the totality of circumstances surrounding a stop to investigate suspicious behavior." *State v. Andrews*, 57 Ohio St.3d 86, 88, 565 N.E.2d 1271 (1991). These circumstances caused Patrolman Ivory to be concerned enough to request backup.

**{¶46}** Furthermore, from the testimony, it appears that Zachary was detained only to determine information about his identity, until the point that he failed to follow police directions, continued to repeatedly place his hands in his pockets, and was handcuffed. "[A] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be the most reasonable in light of the facts known to the officer at the time." *State v. Feliciano*, 11th Dist. Lake No. 2004-L-205, 2006-Ohio-1678, ¶ 22, citing *Adams v. Williams*, 407 U.S. 143, 145, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (the "'Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur'").

**{¶47}** Although the police ultimately conducted a pat-down of Zachary, based on his behavior of repeatedly putting his hands in his pockets, which lead to the discovery of his true identity, he does not argue that this pat-down was improper.

**{¶48}** Finally, it is also noteworthy that, according to Patrolman Ivory's testimony, Danna consented to a search of the vehicle. Zachary asserts that the fruits of the illegal seizure must be suppressed, but it appears that the relevant evidence recovered was found in the car. Zachary does not clarify how the allegedly improper

13

detention to request his identification caused the admission of evidence of the vehicle search when police had already obtained Danna's consent to perform the search.

{¶49} Based on the foregoing, the evidence in the record does not support a conclusion that a motion to suppress on these grounds would have been granted or that counsel was ineffective by failing to file such a motion. To the extent that Zachary argues there are additional facts, not in the record, to support a claim that counsel was ineffective, these should be reviewed through post-conviction relief, not on direct appeal. *State v. Cooperrider*, 4 Ohio St.3d 226, 228, 448 N.E.2d 452 (1983).

{¶50} The first assignment of error is without merit.

{¶51} In his second assignment of error, Zachary argues that the trial court erred by admitting letters exchanged between himself and Danna while they were in jail. He asserts that the co-conspirator exception to the hearsay rule does not apply, since proper independent evidence of a conspiracy was not presented by the State.[1]

{¶52} The State argues that the letters were properly admitted under Evid.R. 801(D)(2)(e), since there was evidence of a conspiracy and they were statements in furtherance of the conspiracy.

{¶53} "[A] trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence." *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271, 569 N.E.2d 1056 (1991). Likewise, "[t]he trial court has broad discretion to

---

1. Although Zachary refers generally to the "letters," he appears to be referring to the letters written by Danna, since these fall under the Evid.R. 801(D)(2)(e) exception addressed in his brief. Evid.R. 801(D)(2)(a) allows the "party's own statement" to be introduced against him, an issue which Zachary does not dispute.

14

determine whether a declaration should be admissible as a hearsay exception." *State v. Dever*, 64 Ohio St.3d 401, 410, 596 N.E.2d 436 (1992).

**{¶54}** "A statement is not hearsay if * * * the statement is offered against a party and is * * * a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy." Evid.R. 801(D)(2)(e). "[T]he statement of a co-conspirator is not admissible pursuant to Evid. R. 801(D)(2)(e) until the proponent of the statement has made a prima facie showing of the existence of the conspiracy by independent proof." *State v. Carter*, 72 Ohio St.3d 545, 550, 651 N.E.2d 965 (1995). To establish independent proof of a conspiracy, the prosecution must provide proof: "(1) of the existence of a conspiracy; (2) of the defendant's participation in the conspiracy; (3) of the declarant's participation in the conspiracy; (4) that the statement was made during the course of the conspiracy; and (5) that the statement was made in furtherance of the conspiracy." (Citation omitted.) *State v. Baker*, 137 Ohio App.3d 628, 653, 739 N.E.2d 819 (12th Dist.2000).

**{¶55}** As an initial matter, Zachary points out that the conspiracy count was dismissed from the indictment. However, the only count that was dismissed relating to this was Engaging in a Pattern of Corrupt Activity, not conspiracy. Regardless, the State was not required to charge Zachary with conspiracy to admit a co-conspirator's statement. *State v. Robb*, 88 Ohio St.3d 59, 723 N.E.2d 1019 (2000) ("[a]lthough the substantive offense of conspiracy was not charged, the state could prove a conspiracy in order to introduce out-of-court statements by conspirators in accordance with Evid.R. 801(D)(2)(e)").

**{¶56}** Zachary does not appear to argue that the State presented no evidence of a conspiracy between Danna and Zachary to commit the crimes, but rather, that there

15

was no separate evidence of a conspiracy "after the fact." However, he fails to provide case law supporting the conclusion that the State is required to present evidence both of the conspiracy to commit the crime and to conceal the crime afterward. Instead, the State is merely required to prove that a conspiracy existed. "[A] declaration of a conspirator, made subsequent to the actual commission of the crime, may be admissible against any co-conspirator if it was made while the conspirators were still concerned with the concealment of their criminal conduct." (Citation omitted.) *State v. Daniels*, 92 Ohio App.3d 473, 483, 636 N.E.2d 336 (1st Dist.1993). Courts have found that letters related to attempts to avoid conviction were admissible under Evid.R. 801(D)(2)(e) in similar circumstances. *See id.* (holding that a letter written nine months after a murder was a statement made in furtherance of the conspiracy, since it suggested how the other defendant should testify and "was motivated by a desire to avoid conviction for the crime"); *State v. Keeton*, 4th Dist. Richland No. 03 CA 43, 2004-Ohio-3676, ¶ 24.

{¶57} Zachary cites *State v. Martin*, 9 Ohio App.3d 150, 458 N.E.2d 898 (11th Dist. 1983), in support of the proposition that the State was required to present separate proof of the conspiracy "after the fact." *Martin*, however, simply provides that the State is required to produce prima facie evidence of a conspiracy and does not make a distinction between evidence of a conspiracy during the crime or after the crime itself has ended. *Id.* at 151-152.

{¶58} Here, there was evidence in the record to establish a prima facie case of the conspiracy between Zachary and Danna. Cell phone records indicated consistent communication on the day of the crime between Zachary and Danna and the two were seen together on that date by several witnesses. Zachary drove Eleanor's van,

16

containing the stolen items, to Danna's house, and she helped him move some of the items into her car. Many of these items were also stored in a safe in Danna's bedroom. The two drove together to Gold Werks to sell some of the stolen items. These facts were enough to establish a prima facie case of conspiracy and allow for the admission of statements related to the conspiracy, i.e., Danna's letters, under Evid.R. 801(D)(2)(e).

{¶59} The second assignment of error is without merit.

{¶60} In his third assignment of error, Zachary argues that his convictions for the murder charges were against the manifest weight of the evidence, since the only evidence that he committed the murder was the testimony of the two inmates regarding Zachary's admission to committing the crime.

{¶61} A challenge to the manifest weight of the evidence involves factual issues. The "weight of the evidence addresses the evidence's effect of inducing belief." (Citation omitted.) *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25; *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997) ("[w]eight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial'") (emphasis sic) (citation omitted). "In other words, a reviewing court asks whose evidence is more persuasive -- the state's or the defendant's?" *Wilson* at ¶ 25.

{¶62} Generally, the weight to be given to the evidence and the credibility of the witnesses are primarily for the trier of fact to determine. *State v. Thomas*, 70 Ohio St.2d 79, 434 N.E.2d 1356 (1982), syllabus. When reviewing a manifest weight challenge, however, the appellate court sits as the "thirteenth juror." (Citation omitted.) *Thompkins* at 387. The reviewing court must consider all the evidence in the record, the reasonable inferences, and the credibility of the witnesses, to determine whether, "in

17

resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." (Citation omitted.) *Id.*

**{¶63}** For Zachary to be convicted of Aggravated Murder, the State was required to prove that he "purposely cause[d] the death of another * * * while committing or attempting to commit * * * aggravated robbery." R.C. 2903.01(B). For the Murder charges, the State was required to prove that he "purposely cause[d] the death of another" and that he "cause[d] the death of another as a proximate result of * * * committing or attempting to commit an offense of violence that is a felony of the first or second degree." R.C. 2903.02(A) and (B).

**{¶64}** Zachary correctly points out that there was no DNA, fingerprint, or fiber evidence to place him at the scene of the murder. However, there was evidence that the shoe prints found in Eleanor's bedroom were of the same size, type, and wear pattern of Zachary's shoes. Although they could not be positively matched due to the lack of distinctive markings such as cuts or imperfections, this at least creates an issue for the jury to consider in weighing the entirety of the evidence.

**{¶65}** Furthermore, there is a great deal of circumstantial evidence connecting Zachary to the crime. "Circumstantial evidence and direct evidence inherently possess the same probative value." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph one of the syllabus; *State v. Griesmar*, 11th Dist. Lake No. 2009-L-061, 2010-Ohio-824, ¶ 50 "'circumstantial evidence * * * may establish an element of the charged offense'") (citations omitted). Evidence and testimony showed that Zachary

18

was living in the vicinity of the victim's home and cell phone records show that he was in the area on the date of the crimes, although a specific location could not be pinpointed. Testimony was also presented that Zachary had a scratch on the inside of his arm, which could be consistent with the fact that Eleanor had defensive wounds.

{¶66} It is reasonable for a jury to infer that the person who was in possession of the stolen property was the one who ransacked Eleanor's home. Zachary was found in possession of numerous pieces of Eleanor's property on the day she was initially discovered missing and was found dead. He had not only her property such as jewelry and memorabilia, but was also in possession of her van. These facts all point to Zachary being in the home and stealing the property. It would be a far-fetched scenario to believe that Zachary committed the burglary and a completely unrelated murder of Eleanor coincidentally occurred on the same date.

{¶67} In addition to the foregoing circumstantial evidence, two jail inmates, Gould and Sullivan, testified that Zachary admitted to the murder. Sullivan stated that Zachary told him "that he didn't believe that he stabbed [the victim] 90 times. He believed it was closer to nine than 90." Gould explained various details of the crime that Zachary described to him, including that Zachary did stab Eleanor. Zachary asserts that this testimony does not prove that he confessed, since the newspapers accessible to the inmates could have provided them with the details necessary to invent such a confession and that the individuals had incentive to do so, based on the deals they made with prosecutors. However, Lieutenant Brown testified that Gould told him some details that were consistent with the police investigation and that were not mentioned in a newspaper article, including that a screwdriver was the weapon rather than a stick or a knife, there was nail polish remover used to help accelerate the fire, and that the door

19

was barricaded with chairs. This lends credibility to Gould's story and his assertion that he received the information from Zachary rather than a newspaper article.

**{¶68}** This court has noted that, even in cases involving "jailhouse snitch testimony," the court must be "mindful of the fact that questions of credibility of witnesses are matters left to the trier of fact." *State v. Burrows*, 11th Dist. Trumbull No. 2000-T-0089, 2002-Ohio-1961, ¶ 174. The jury was aware of the circumstances surrounding the testimony and was in the best position to determine if it was believable and how much weight to give it.

**{¶69}** Based on the foregoing, we cannot find that the jury clearly lost its way in weighing the evidence and convicting Zachary of the murder charges in this case.

**{¶70}** The third assignment of error is without merit.

**{¶71}** For the foregoing reasons, the judgment of the Lake County Court of Common Pleas, finding Zachary guilty of Aggravated Murder, Murder, Aggravated Robbery, Aggravated Burglary, Felonious Assault, Tampering with Evidence, Grand Theft of a Motor Vehicle, Theft from an Elderly Person, and Receiving Stolen Property, is affirmed. Costs to be taxed against appellant.


THOMAS R. WRIGHT, J.,

COLLEEN MARY O'TOOLE, J.,

concur.

20